## A00A1685. CITRON et al. v. GHAFFARI et al.
### (542 SE2d 555)

POPE, Presiding Judge.

The sole issue in this case is whether an eight-week-old fetus whose only movement at the time of its death was a heartbeat can be considered "quick" under Georgia law, thus allowing the parents of the unborn child to assert a claim of wrongful death against the treating physicians. Because we conclude as a matter of law that a heartbeat alone is not sufficient movement to constitute quickening, we reverse the trial court's denial of the physicians' motion for summary judgment.

Tony and Gisso Ghaffari filed this medical malpractice action against Steven J. Citron, M.D., and Farr Nezhat, M.D., arising out the death of their unborn child. The trial court denied the doctors' motions for summary judgment as to the Ghaffaris' claim of wrongful death and certified its order for immediate review. We granted the doctors' application for interlocutory appeal.

Construed in favor of the nonmoving party, the record shows that in October 1994, Gisso Ghaffari consulted Dr. Nezhat after she suffered the second of two miscarriages. Dr. Nezhat diagnosed and treated Gisso for endometriosis.

Subsequently, on March 8, 1995, Dr. Nezhat did an ultrasound and blood tests on Gisso, which indicated that she was approximately six weeks pregnant. Dr. Nezhat read the ultrasound as showing a normal intrauterine pregnancy. During the next week, however, Gisso began to experience severe nausea and vomiting. And on March 17, 1995, Dr. Nezhat admitted Gisso to Northside Hospital to treat her with IV fluids for dehydration.

On March 20, 1995, Dr. Nezhat ordered a second ultrasound. The ultrasound films were reviewed by Dr. Citron, a radiologist. Dr. Citron read this ultrasound as showing a definite right cornual pregnancy with an estimated gestational age of seven weeks, four days. A cornual pregnancy is a pregnancy that occurs at the entrance of the fallopian tube into the uterine cavity, but outside of the uterine cavity. It is a kind of ectopic pregnancy and thus cannot be successfully carried to term.

After speaking with Dr. Citron, Dr. Nezhat advised the Ghaffaris that the pregnancy was ectopic and informed them that it posed a serious risk to Gisso's health and even her life. Dr. Nezhat gave the

Ghaffaris two options for terminating the pregnancy: (1) surgery or (2) a medical procedure involving the administration of the drug methotrexate. Due to the risks of surgery, Dr. Nezhat recommended the medical option, and the Ghaffaris followed his advice. Following the administration of methotrexate, Gisso was discharged home, where she continued to experience nausea and vomiting. She was readmitted to the hospital the next day on March 21, 1995. On March 24, 1995, a follow-up ultrasound was performed by hospital personnel and read by Dr. James Barry Weinstein. Dr. Weinstein interpreted the ultrasound to show a normal intrauterine pregnancy. But when Dr. Weinstein reviewed the March 20 ultrasound, he agreed with Dr. Citron that the earlier sonogram showed a cornual pregnancy. This contradictory finding led Dr. Nezhat to consult with two other physicians, Dr. Daniel Eller and Dr. Benedict Benigno, about the possible hazards of administering methotrexate in the case of a normal intrauterine pregnancy. Dr. Eller explained to Dr. Nezhat that there were not much data on this subject, but he felt there was a 30 percent chance the baby would be deformed and abnormal because of the use of methotrexate. Dr. Benigno stated that there was a high possibility of fetal abnormality because the injection was given in the first trimester.

After consulting with these physicians, Dr. Nezhat told the Ghaffaris that the latest ultrasound showed the pregnancy was normal. Then, Dr. Nezhat called Dr. Eller in to consult with the Ghaffaris. Dr. Eller performed yet another ultrasound and confirmed that the pregnancy was intrauterine. The doctors told the Ghaffaris that there was a 30 percent chance that their baby would be abnormal and advised them that Gisso could have an abortion or they could wait and do further testing to determine if there were any abnormalities. According to the Ghaffaris, Dr. Nezhat recommended an immediate abortion, although Dr. Nezhat denies making such a recommendation. After listening to the doctors, the Ghaffaris consented to a suction dilation and curettage procedure to terminate the pregnancy. At the time of this procedure, the gestation period was approximately eight weeks.

1. In addressing the death of a child prior to birth, Georgia has historically adhered to the concept of "quickening." Georgia's most recent feticide statute, adopted in 1982, applies only to the murder of "an unborn child so far developed as to be ordinarily called 'quick.'" OCGA § 16-5-80. This statute was "nothing more than a continuation of a criminal provision which existed for many years in this state and in turn rested on English law going back to 1803." *Brinkley v. State*, 253 Ga. 541, 544 (1) (322 SE2d 49) (1984). And this Court drew upon the then-existing criminal law when it recognized a cause of action for the wrongful death of an unborn child where the child is quick at

the time of its death. *Porter v. Lassiter*, 91 Ga. App. 712, 715-716 (87 SE2d 100) (1955).[1]

"The concept of 'quickening' is defined as that point in time when the fetus 'is able to move in its mother's womb.' [Cit.]" *Shirley v. Bacon*, 154 Ga. App. 203, 204 (267 SE2d 809) (1980). See also *Summerlin v. State*, 150 Ga. 173, 176 (103 SE 461) (1920) (defining an unborn child who is "quick" as a child " 'so far developed as to move or stir in the mother's womb' "). While the law does not designate a definite time in a pregnancy when quickening occurs, prior decisions have noted that quickening generally occurs sometime between the tenth week and the fourth month of pregnancy. See *Brinkley v. State*, 253 Ga. at 542; *Biegun v. State*, 206 Ga. 618, 627 (7) (58 SE2d 149) (1950).

Here, Gisso Ghaffari was only in her eighth week of pregnancy and had felt no movement. It is uncontradicted that the only movement detected in any of the sonograms was a fetal heartbeat. There is nothing in the record to indicate that the heartbeat of an eight-week-old fetus could be felt by the mother. Nor is there any evidence that the child had developed to the point where it was capable of any other movement.

Although this Court has held that there is no requirement that the mother actually have felt movement in order to establish quickening, there must be evidence that the child is at least capable of movement. *Shirley v. Bacon*, 154 Ga. App. at 204-205. The holding in *Shirley* presumably reflects that advances in technology allow a physician to detect an unborn child's movement before a mother may actually recognize it. Nevertheless, we find that the concept of quickening necessarily contemplates proof of the kind of movement that a mother potentially could feel, such as the movement of an arm or a leg.

To hold otherwise would make the concept meaningless. Presumably, with the right equipment, movement resulting simply from the biological process of fetal development could be detected from the very onset of pregnancy. Therefore, were we to adopt the Ghaffaris' argument that a heartbeat demonstrates quickening because it can be seen on a sonogram, we would effectively be recognizing a cause of action for wrongful death at any point during pregnancy. This would be a marked shift in the treatment of unborn children under Georgia

---

[1] Georgia appears to be unique in its adherence to the concept of quickening. The majority of jurisdictions that recognize a cause of action for wrongful death of a fetus limit such actions to claims arising after the fetus is viable. A viable fetus is "capable of independent existence outside his or her mother's womb, . . . even if only in an incubator." (Citations omitted.) Black's Law Dictionary, p. 1566 (6th ed. 1990). Viability thus presumably occurs later than quickening. Only a few states recognize a cause of action for wrongful death at any point in a pregnancy. See 84 ALR3d 411.

law[2] and may more properly be the subject of legislative action.

Accordingly, we hold as a matter of law that the child in this case was not "quick" and thus that the trial court erred in denying the motions for summary judgment filed by Dr. Nezhat and Dr. Citron.

2. Due to our holding in Division 1, we do not reach the appellants' second enumeration of error.

*Judgment reversed. Miller and Mikell, JJ., concur.*

DECIDED NOVEMBER 16, 2000 — 

*Browning & Tanksley, David V. Johnson, Henry D. Green, Jr., Cochran, Cherry, Givens, Smith & Sistrunk, Hezekiah Sistrunk, Jr., Jane L. Sams, Webb, Carlock, Copeland, Semler & Stair, Daniel J. Huff,* for appellants.

*Jennings, Sparwath & Satcher, Stephen H. Sparwath,* for appellees.

---

[2] Compare, e.g., *Hornbuckle v. Plantation Pipeline Co.*, 212 Ga. 504 (93 SE2d 727) (1956) (allowing a child who survives birth to assert a cause of action for an injury occurring at any point in its prenatal life) with *Peters v. Hosp. Auth. of Elbert County*, 265 Ga. 487, 488 (1) (458 SE2d 628) (1995) (holding that no claim can be asserted on behalf of a stillborn child for injuries sustained during pregnancy).