# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-IA-00358-SCT

*66 FEDERAL CREDIT UNION, MISSISSIPPI AUTO RECOVERY, INC., AND GRANT BROWNLEE, INDIVIDUALLY AND AS AGENT AND EMPLOYEE OF MISSISSIPPI AUTO RECOVERY, INC., DR. SCOTT NELSON AND BOLIVAR LEFLORE MEDICAL ALLIANCE, LLP*

*v.*

*TRACY TUCKER*

| | |
|---|---|
| DATE OF JUDGMENT: | 2/15/2001 |
| TRIAL JUDGE: | HON. KENNETH L. THOMAS |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | TERRY R. LEVY |
| | AUDREY CAROLYN CURRY |
| | THOMAS C. GERITY |
| | CLINTON M. GUENTHER |
| ATTORNEY FOR APPELLEE: | ELLIS TURNAGE |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED AND REMANDED - 08/21/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. The case at bar is an interlocutory appeal presenting the Court with the first impression issue of whether our wrongful death statute, Miss. Code Ann. § 11-7-13 (Supp. 2002), creates a cause of action for the death of a non-viable fetus, en ventre sa mere. Consistent with the language found in Miss. Code Ann. § 97-3-37 (Rev. 2000), we hold that the wrongful death statute, Miss. Code Ann. § 11-7-13 (Supp. 2002), includes an unborn child that is "quick" in the womb as a "person."

## FACTS

¶2.     Tracy Tucker bought an automobile from a dealership in Cleveland, Mississippi. She financed the purchase through 66 Federal Credit Union ("Credit Union"), her employer's credit union. Tucker pledged the car as collateral for the loan under the terms of the loan documents in which she gave the Credit Union the right to take possession of the car "without going to court and without giving advance notice" upon default. The following year, her account was in default. The Credit Union contacted Mississippi Auto Recovery, Inc. ("MARI") to repossess Tucker's car. MARI assigned Grant Brownlee to repossess the car.

¶3.     On February 5, 1997, Brownlee attempted to repossess the car. The attempt failed. Tucker maintained possession of the car despite the delinquent account. Tucker alleges that during the course of the attempted repossession, a "breach of the peace" occurred. The Credit Union, MARI and Brownlee deny the allegation.

¶4.     Tucker contends that she was approximately five months pregnant at the time of the repossession attempt. Dr. Scott Nelson saw Tucker on the eve of the attempted repossession for a complaint of vaginal itching. He treated her symptoms and performed an ultrasound which indicated a 19-week-old fetus. Tucker also alleges that Dr. Nelson made a negligent diagnosis. She argues that if the death of the fetus was caused by infection, then Dr. Nelson and his employer, Bolivar Leflore Medical Alliance, LLP, are liable for the wrongful death of the fetus.

¶5.     On the evening of the attempted repossession, Tucker experienced stomach pains and was admitted to Bolivar County Hospital. She was released the next day and readmitted that same night for continued itching. On February 8, three days after the attempted repossession, Tucker miscarried.

2

¶6.     Tucker filed this lawsuit against 66 Federal Credit Union, Mississippi Auto Recovery, Inc. and Grant Brownlee, an agent and employee of Mississippi Auto Recovery, Inc. Tucker allegedly incurred damages as a result of the attempted repossession of her automobile. Tucker asserts that those defendants are liable for negligent repossession, negligent misrepresentation, breach of the peace, assault and battery, negligence, intentional and negligent infliction of emotional distress, conversion and wrongful death. She also alleged that Dr. Scott Nelson and Bolivar County Medical Alliance, LLP committed medical malpractice that resulted in the wrongful death of her fetus.

¶7.     All of the defendants filed motions for partial summary judgment claiming that the death of a non-viable fetus does not give rise to a wrongful death action. All parties and the trial court agree that the fetus was not viable at the time of the miscarriage. The trial court entered an order denying the motions for partial summary judgment on Tucker's wrongful death claim. The trial court certified interlocutory appeal to this Court which we granted. *See* M.R.A.P. 5.

## DISCUSSION

¶8.     The issue before the Court is whether Mississippi's wrongful death statute creates a cause of action for the death of a non-viable fetus en ventre sa mere.[1]  This is a case of first impression. The standard of review is de novo.

¶9.     To distinguish between  viability and nonviability resurrects the same distinctions that led to the adoption of the wrongful death statutes in the first place. When a family loses a potential member because

---

[1] "En ventre sa mere" is defined as "in its mother's womb." Black's Law Dictionary 369 (16th ed. 1996).

of tortious conduct of another, it suffers an injury of the same order as when it loses an existing member.

¶10.    The pertinent history surrounding the issue begins with the landmark decision, *Dietrich v. Inhabitants of Northampton*, 138 Mass. 14 (1884), in which Justice Holmes wrote that the common law did not recognize an action for prenatal injuries to a child.  That  rule was based on the idea that a duty could not be owed to an unborn plaintiff since it is still part of the mother.  As the right to maintain an action for wrongful death did not exist, it was cheaper to kill a person than to injure him.  W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* §127, at 945 (5th ed. 1984).  Because of the harsh results of the common law rule, state legislatures enacted wrongful death statutes to correct what was considered to be an intolerable result.  *Id*.

¶11.    The  dissent in *Allaire v. St. Luke's Hospital*, 56 N.E. 638 (Ill. 1900), criticized the in *Dietrich* rule.  The *Allaire* dissent called for the fetus to be recognized when it becomes viable and capable of existing separately from its mother.  This decision was followed by most courts  until *Bonbrest v. Kotz*, 65 F. Supp. 138 (D.D.C. 1946), which "brought about the most spectacular abrupt reversal of a well-settled rule in the whole history of the law of torts ... So rapid has been the overturn that ... it is now apparently literally true that there is no authority left still supporting the older rule."  Prosser, The Law of Torts § 55, at 336, 337 (4th ed. 1971). *Bonbrest* was a medical malpractice case where the infant-plaintiff sought recovery for prenatal injuries sustained during delivery.  *Bonbrest* represented a sharp break with the past by recognizing a right of recovery after the fetus attained viability.

¶12.    Along with the right to recover for prenatal injuries came questions about the required stage of development of the child when injured.  Those questions asked whether the child had to be "quick" in its

4

mother's womb, or whether the child had to be viable, or whether the child had to survive birth. A "quick child" is defined as a child "that has developed so that it moves within the mother's womb." Black's Law Dictionary 1415 (4th ed. 1968). "Viable" is a "term applied to a newly-born infant, and especially to one prematurely born, which is not only born alive, but in such a state of organic development as to make possible the continuments of its life." *Id.* at 1737.

¶13. Recovery for prenatal injuries when a child is born alive is permitted in every jurisdiction in the country. *See Farley v. Sartin*, 466 S.E. 2d 522, 528 (W. Va. 1995). Six states allow recovery for a non-viable fetus that dies while still in the womb. *Id. See Porter v. Lassiter*, 87 S.E.2d 100, 102 (Ga. Ct. App. 1955) (allowing recovery for the death of an unborn child "so far developed as to be ordinarily called 'quick'" or capable of moving in its mother's womb); *Smith v. Mercy Hosp. & Med. Ctr.*, 560 N.E.2d 1164 (Ill. App. Ct. 1990)(viability of fetus not necessary to maintain wrongful death action);*Danos v. St. Pierre*, 402 So. 2d 633, 638 (La. 1981) (relying on legislative pronouncement "that a human being exists from the moment of fertilization and implantation");*Connor v. Monkem Co.*, 898 S.W.2d 89 (Mo. 1995) (relying on statute that extends to unborn children from the moment of conception all rights enjoyed by other persons); *Wiersma v. Maple Leaf Farms*, 543 N.W.2d 787 (S.D. 1996) (citing statutory language which shows that the clear legislative intent to encompass nonviable children in the term "unborn child."); *Farley v. Sartin*, 466 S.E.2d 522, 533 (W. Va. 1995) (announcing that despite the lack of legislative guidance a cause of action for the wrongful death of a nonviable fetus exists since "societal and parental loss is egregious regardless of the state of fetal development."

¶14. The Mississippi wrongful death statute, Miss. Code Ann. § 11-7-13, states in pertinent part:

> Whether the death of *any person* shall be caused by any real, wrongful, or negligent act
> or omission, or by such unsafe machinery, way or appliances as would, if death had not

5

ensued, have entitled the party injured or damaged thereby to maintain an action and recover damages in respect thereof...The action for such damages may be brought in the name of the personal representative of the deceased person for the benefit of all persons entitled under the law to recover, or by widow for the death of her husband, or by the parent of a child, or in the name of a child for the death of the parent...

(emphasis added).

¶15.    The Mississippi, wrongful death statute creates a cause of action for the wrongful death of an unborn child where the fetus was viable at the time of death. *Sweeney v. Preston*, 642 So.2d 332 (Miss. 1994); *Terrell v. Rankin*, 511 So. 2d 126 (Miss. 1987); *Rainey v. Horn*, 221 Miss. 269, 72 So. 2d 434 (1954).

¶16.    *Rainey* specifically addressed an action for the wrongful death of a fetus that was viable at the time of injury and death.  As specifically limited to that holding, this Court did not "pass upon the question of the negligent injury or death of a foetus at an earlier age" when speaking *only* to:

> [t]he broad principles of the common law [that] embrace the subject of our inquiry in this case.  We find no sound reason why we should withhold the processes of law from an unborn child that has reached the prenatal age of viability when it is capable of a separate and independent existence from its mother.  Such child is entitled to the protection of its person.
> We hold, therefore, that an unborn child after it reaches the prenatal age of viability when the destruction of the life of its mother does not necessarily mean the end of its life also, and when, if separated from its mother would be so far a matured human being that it would live and grow mentally and physically, is a person; and if such child dies before birth as the result of the negligent act of another, an action may be maintained for its death under the wrongful death statute.

*Rainey*, 221 Miss. at 283, 72 So. 2d at 439-40.

¶17.    This Court has addressed whether a mother could recover damages as an element of her own personal injuries when she miscarried at five and one half months. *Occhipinti v. Rheem Mfg. Co.*, 252 Miss. 172, 172 So.2d 186 (1965).  We explained that:

[t]he mother may recover for her own injuries. The question is whether those injuries of the mother may include the effects of the death of the fetus. By way of emphasis, we are not concerned here with whether the estate of an unborn, non-viable child may have a separate recovery under the wrongful death statute. The mother seeks to recover for her injuries only, and asserts that they include the loss of the child, as a particular, independent element of damages in her action.

*Id.* at 190. *Occhipinti* did not address the wrongful death statute or the viability standard. Instead, the holding allows the mother to recover damages for her own physical and mental suffering resulting from the death of the fetus.

¶18.    Whether an unborn fetus, who was at six and one half months gestation at the time of his brother's death is defined as "living" such that the fetus has beneficiary status under the wrongful death statute was the sole issue before this Court in the case of *In re Davis*, 706 So. 2d 244, 245 (Miss. 1998). Tarrance Davis was born on July 10, 1986, and died on January 15, 1988, from permanent brain damage which was the result of a traumatic birth. *Id.* His beneficiaries filed a lawsuit for medical negligence. The chancery court was asked to determine his sole heirs at law. *Id.* In light of Miss. Code Ann. § 11-7-13, the chancery court found that his mother and two of his brothers were his only heirs and specifically excluded Rico, a third brother born after Tarrance's death.

¶19.    Later, Rico's guardians filed another petition asking the court to again determine Tarrance's heirs and wrongful death beneficiaries. 706 So. 2d at 245-46. The court designated Rico as an heir but did not allow his inclusion as a wrongful death beneficiary under the wrongful death statute. *Id.* at 246. The guardians appealed arguing that there was no legal foundation for defining "living" under the statute as a viably born, living individual. *Id.* They insisted that *Rainey* formulated the test used in defining "living." *Id.*

¶20.    This Court agreed and extended the *Rainey* test to questions of beneficiary status reciting that "a pre born child who is viable at the time of a relative's death and is ultimately born alive is 'living' such that he or she can be a wrongful death beneficiary under the law." *Id.* at 247. The Court maintained confidence "that such a rule accords with the traditional protections that have been afforded the unborn under our common and statutory law." *Id.*

¶21.    The U.S. District Court for the Northern District of Mississippi made an *Erie* prediction which reflects that court's interpretation of beneficiary rights of a non-viable fetus within the Mississippi wrongful death statute. *Childs v. Gen. Motors Corp.*, 73 F. Supp. 2d 669 (N.D. Miss. 1999); *see also Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed 1188 (1938). The court concluded that Mississippi law allows wrongful death benefits after a tortious act which causes the death of an unborn child in utero. 73 F. Supp. 2d at 674. The federal court determined that whether the child reaches the stage of prenatal viability is of no concern in Mississippi jurisprudence. *Id.*

¶22.    The purposes of the wrongful death statute are to prevent the wrongful termination of life and provide the beneficiary with compensation for the loss of companionship and society of the deceased, the pain and suffering of the deceased between injury and death, and punitive damages. *See McGowan v. Estate of Wright*, 524 So.2d 308, 311 (Miss. 1988). We decline to draw a line at viability. The wrongful death statute creates a general cause of action and designates its beneficiaries without specifying whether a fetus is considered a "living" "individual" or "person" whose death could give rise to such an action. Finding pertinent language in Miss. Code Ann. § 97-3-37, we maintain consistency with our criminal statute's express limitation that "the willful killing of an unborn *quick* child, by an injury to the mother of such child, which would be murder if it resulted in the death of the mother, shall be manslaughter."

8

Miss. Code Ann. § 97-3-37 (emphasis added). *See also* **Willis v. State**, 518 So.2d 667 (Miss. 1988); **Sitton v. State**, 760 So.2d 28 (Miss. Ct. App. 1999). **Willis** guides us in defining the "quick child" as "one that has developed so that it moves within the mother's womb." **Id.** at 668 (citing Black's Law Dictionary 1415 (4th ed.)). *Accord,* **Shirley v. Bacon**, 267 S.E.2d 809, 811 (Ga. Ct. App. 1980).

¶23.    The Georgia Supreme Court has adopted similar reasoning using language from the Georgia criminal code along with common law as recited in Book I, page 130, of Blackstone's Commentaries on the Laws of England:

> [t]he right of personal security consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation. Life is the immediate gift of God, a right inherent by nature in every individual; and it begins in contemplation of law as soon as an infant is able to stir in the mother's womb. An infant en ventre sa mere, or in the mother's womb, is supposed in law to be born for many purposes. It is capable of having a legacy, or a surrender of a copyhold estate, made to it. It may have a guardian assigned to it; and it is enabled to have an estate limited to its use, and to take afterwards by such limitation, as if it were then actually born. And in this point the civil law agrees with ours.

**Tucker v. Howard L. Carmichael & Sons**, 65 S.E.2d 909, 910 (Ga. 1951). The Georgia Supreme Court reasoned:

> Life begins when the child is able to stir in the mother's womb. It can have a legacy, can own an estate, and a guardian can be assigned to it. It cannot seriously be denied that the purpose of the common law in allowing the appointment of a guardian for the unborn child is to make available processes of the law for the protection and preservation of the properties belonging to the child. There is nothing in the common law to indicate that it would withhold from such a child its processes for the purpose of protecting and preserving the person as well as the property of such child. It would therefore seem to us to be an unwarranted reflection upon the common law itself to attribute to it a greater concern for the protection of property than for the protection of the person. Whether the recognition of the right of property in the unborn child is founded upon the welfare of the child or of society, each of these is more vitally concerned about the physical impairments of the child itself than about its property. It would therefore be illogical, unrealistic, and unjust--both to the child and to society--for the law to withhold its processes necessary for the protection of the person of an unborn child, while, at the same time, making such processes available for the purpose of protecting its property.

*Id.* at 910-11. Just as we have chosen the same language used by the Legislature in our criminal statute, *Tucker* is based on a Georgia criminal statute. *Id.* at 912 (citing Ga. Code § 26-1103 (1933)). The court cited the purpose of criminal law in protection of both the individual and society from criminal conduct. *Tucker*, 65 S.E.2d at 912. Reasoning that since the law regards the killing of the unborn child as a sufficient injury to society to justify the imposition of punishment, a "logical and just" decision allows the child "to employ legal process and recover damages for the injury inflicted upon it." *Id.* A different result is "contrary to every principle of right and justice, which are the very essence of law, to deny such rights to the injured child." *Id.* *Tucker* further suggests that nothing in the common law justifies denial of this right to the child. *Id.*

¶24. In Georgia, an action for the wrongful death of an unborn child may be maintained if the child was "quick" at its death (not at the time of injury). *Porter v. Lassiter*, 87 S.E.2d 100 (Ga. Ct. App. 1955). In *Porter* the court confronted the questions on recovery for "the full value 'for the death of her child' when the death is caused by injury prior to birth" and "to what extent an unborn child must be developed before a mother can sue for the value of the life of her child." *Id.* Lassiter was 1 ½ months pregnant at the time of the accident. *Id.* at 102. The miscarriage and death of the child occurred when she was 4 ½ months pregnant. *Id.* She blamed the other driver for negligence causing her injuries and the resulting death of her child. *Id.* Using the Georgia criminal code, "quick" was defined as an unborn child "so far developed as to move or stir in the mother's womb.'" *Id.* at 102 (citations omitted). The court rejected the viability distinction. *Id.* at 103. The court also answered whether the cause of action arose on the date of the mother's injury or on the date of the child's death. *Id.* at 103. Because "the plaintiff could not sue for the homicide of the child on the date of the automobile collision since the homicide (death) was essential to the

10

filing of the suit," the court held that the cause of action dates from the death of the child. *Id.* Finally, the determination of whether a child is "quick" was assigned to the jury as the finder of fact. *Id.* In *Shirley v. Bacon*, 267 S.E.2d 809 (Ga. Ct. App. 1980), the same court overturned a summary judgment against a mother who was two to three months pregnant when forced to undergo a therapeutic abortion because of her injuries after an automobile collision. *Id.* at 810. The mother testified that she did not feel the fetus move any time before the abortion. *Id.* at 811. The court found her testimony inconclusive in resolving whether the fetus was "quick" or "able to stir or move within its mother's womb." *Id.* The court explained that "there is no rule in this state that 'quickening' occurs, as a matter of law, only during the fourth month of pregnancy." *Id.* The court specified that "[t]he mere fact that appellant had not felt the movement of the fetus does not necessarily mean that the fetus did not move or was not capable of movement at the time of the unborn child's death." *Id.* *Shirley* presumably reflects that advances in technology allow a physician to detect an unborn child's movement before a mother may actually recognize it.

¶25.    However, a wrongful death claim was denied for the death of an eight-week-old fetus when, at the time of death, the only indication of movement was a heartbeat detected by a sonogram. *Citron v. Ghaffari*, 542 S.E.2d 555 (Ga. Ct. App. 2000). The court determined that the fetus was not "quick." *Id.* The court commented that "while the law does not designate a definite time in a pregnancy when quickening occurs, prior decisions have noted that quickening generally occurs sometime between the tenth week and the fourth month of pregnancy." *Id.* at 556-57; *see Brinkley v. State,* 322 S.E.2d 49 (Ga. 1984); *Biegun v. State,* 58 S.E.2d 149 (Ga. 1950). Even with technological advances, the court explained "the concept of quickening necessarily contemplates proof of the kind of movement that a mother potentially could feel, such as the movement of an arm or a leg." *Citron*, 542 S.E.2d 557 (citing *Shirley*,

267 S.E.2d at 809). The court indicated that a decision without that requirement would be meaningless since:

> with the right equipment, movement resulting simply from the biological process of fetal development could be detected from the very onset of pregnancy. Therefore, were we to adopt the Ghaffaris' argument that a heartbeat demonstrates quickening because it can be seen on a sonogram, we would effectively be recognizing a cause of action for wrongful death at any point during pregnancy.

*Id.* at 828-29.

¶26. In *Sitton*, 760 So.2d at 30, the Mississippi Court of Appeals found photographic evidence helpful in determining whether an unborn child is "quick" in the womb. *Id.* A woman who was seven months pregnant died after being struck by a van. *Id.* Her unborn twins also died as the result of her injuries. *Id.* Photographs of the deceased twins were of "considerable probative value in demonstrating that the babies were 'quick' as required to satisfy the elements of manslaughter pursuant to Miss. Code Ann. § 97-3-37 (Rev. 1994)." *Id.* at 31. Also relevant was the testimony of a forensic pathologist, Dr. Steven Hayne, who testified that the babies were well-formed and developed to a stage where they could move spontaneously within their mother's womb. *Id.* Using that evidence, the court was satisfied that they were "quick" as required by § 97-3-37. *Id.* at 32. Following the holding of the Georgia Supreme Court and applying the reasoning aforementioned as it relates to our criminal statute concerning quick in the womb, we hold that our wrongful death statute includes a fetus who is "quick" in the womb as a "person" within the language of that statute, that the cause of action dates from the death of the child and the determination of whether a child is "quick" in the womb is assigned to the jury as the finder of fact.

¶27. We note also that the separate opinion of Justice Cobb concurring in result has merit as to its view. However, as this Court did in *Davis*, we note that a distinction exists "between previable and viable fetuses"

and that it is "embedded in this Court's prior interpretations of the wrongful death statute." 706 So. 2d at 248. "We are ever mindful of the abiding principle that "[j]udges ought never to give their opinion on a law till it comes before them." *Id.* at 248 citing *Lanier v. State*, 635 So. 2d 813, 820 (Miss. 1994) (Hawkins, C.J., concurring)). Thus, the *Davis* Court correctly declined to address an issue not specifically before it. In the case at bar the facts clearly present a situation where the preborn child was "quick" in the womb, which generally occurs between the tenth week and the fourth month of pregnancy. *Citron*, 542 S.E.2d at 556-57. As in *Davis*, this Court declines to expand our decision to address facts and issues not before the Court for decision. Hence, we leave that question to another day where the appropriate, specific facts and circumstances properly raising the question of whether to apply the concept of "life commencing at the moment of conception" for an unborn as being applicable for a claim under the wrongful death statute. *Davis*, 706 So. 2d at 248.

¶28.    This Court has addressed the problems of conjecture and speculation in whether a prenatal injury was the cause of death of a child. *Rainey,* 72 So. 2d at 438. This Court called such an invalid reason to deny recovery since our law does not allow judgments based on speculation or conjecture. *Id.* We have also addressed the possible problem of fictitious claims. *Id.* As stated in *Rainey*, the possibility of fraud in this type of case is no greater than in many types of tort claims. *Id.* at 439. Other courts have also rejected these contentions, including the Louisiana Supreme Court which stated that "[t]he denial of valid claims in order to discourage fraudulent ones and to avoid difficult problems in determining causation and fixing damages not only is illogical, but also disregards the very essence of the judicial process." *Danos v. St. Pierre*, 402 So. 2d 633, 638 (La. 1981). *See also Espadero v. Feld*, 649 F. Supp. 1480, 1485 (D. Colo. 1986); *Hatala v. Markiewicz*, 224 A.2d 406, 408 (Conn. Super. Ct. 1966); *Mone v.*

13

*Greyhound Lines, Inc.*, 331 N.E. 2d 916, 919 (Mass. 1975). Our Court has long recognized the value of expert testimony. Some speculation in medical matters is allowable and necessary; "a doctor's expert opinion as to causation need only be 'expressed in terms of medical probability or possibility.'" *Brandon HMA, Inc. v. Bradshaw*, 809 So. 2d 611, 617 (Miss. 2001) (quoting *Pittman v. Hodges*, 462 So. 2d 330, 334 (Miss. 1984)). It must be conceded that the same difficulties as to proving causation and damages would attend this type of case and one in which the fetus was viable at the time of death.

¶29. However, such difficulties and risks are not justification for imposing a bar to possible legitimate claims. The public and social policy of this state is to protect life. Accordingly, when the plaintiff can prove liability and damages by a preponderance of the evidence, the recovery of damages is permitted and is to be determined by a jury. The very purpose of our statute is to protect life and prevent unlawful, wrongful, tortious acts of omission or negligence of others which results in the death of another person.

¶30. The dissent, in a rather weak attempt to confuse the issues as well as the bench, bar and public, claims that this Court's decision implicates the holding of the United States Supreme Court's landmark decision in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). We disagree. In *Roe*, certain abortion statutes were struck down as overly broad and vague, violating the Fourteenth Amendment. The Supreme Court addressed the issue of what constitutes a "person" for Fourteenth Amendment purposes. The State unsuccessfully argued that to prevent the State from regulating abortions to protect life is a violation of the Fourteenth Amendment since a fetus is a "person." *Roe* reminds that the Constitution:

> does not define 'person' in so many words ... But in nearly all these instances [where 'person' is mentioned in the Constitution], the use of the word is such that it has application only postnatally ... All this, together with our observation, ... persuades us that the word 'person,' as used in the Fourteenth Amendment, does not include the unborn.

14

*Id.* at 179, 93 S.Ct. at 739.

¶31.   We conclude that *Roe* is not implicated here. The right to an abortion protects the woman's "liberty interest" and "fundamental right to privacy" when voluntarily choosing to end her pregnancy during the first trimester. *See Roe*, 410 U.S. at 113; ***Wiersma v. Maple Leaf Farms***, 543 N.W.2d 787. The Illinois Appellate Court has also disagreed that the constitutional rights of a mother as outlined in *Roe* have any relation to the rights of a defendant who causes the wrongful death of a fetus when differentiating that:

> a pregnant woman who chooses to terminate her pregnancy and the defendant who assaults a pregnant woman, causing the death of her fetus, are not similarly situated. A woman consents to the abortion and has the absolute right, at least during the first trimester of the pregnancy to terminate the pregnancy. A woman has a privacy interest in terminating her pregnancy; however, defendant has no such interest.

*People v. Ford*, 581 N.E.2d 1189, 1199 (Ill. App. Ct. 1991). Further, the South Dakota Supreme Court defined:

> "[v]iability" as a developmental turning point, was embraced in abortion cases to balance the privacy rights of a mother as against her unborn child. For any other purpose, viability is purely an arbitrary milestone from which to reckon a child's legal existence.

*Wiersma*, 543 N.W.2d at 792. Our sister state of West Virginia has also concluded that *Roe* is not implicated in the issue now before the Court, stating that "[t]he abortion question simply is not relevant to wrongful death." *See **Farley v. Sartin***, 466 S.E.2d at 534. The dissent's alleged concerns about physicians preforming abortions is but a smokescreen and a thinly disguised ruse which raises no legitimate concerns. Physicians performing abortions are still afforded protection by our criminal statute, Miss. Code Ann. § 97-3-37(6) (Rev. 2000) and under the principles of ***Roe v. Wade***. The dissent's alarm is

completely misplaced. ¶32. Tucker and the State share a common interest and goal to preserve the life of a fetus injured by the conduct of another. Tucker's interest is to protect and preserve the life of her unborn child not in the exercise of her right to terminate that life which has been declared constitutional by the United States Supreme Court. Except for a mother's rights, as delineated in *Roe*, there are no such rights involved in this action for the wrongful death of an unborn child.

## CONCLUSION

¶33. Viability is not the appropriate criterion to determine whether the unborn is a "person" within the context of the wrongful death statute. There is merit to the concurring opinion claim that the term viability is not a meaningful distinction. In truth, a viability standard is arbitrary and all too often results in an injustice when a non-viable fetus would have most likely survived, but for the intervening wrongful, tortious conduct of another. Then, to make matters worse, the wrongdoer goes unpunished and totally escapes liability for inflicting fatal injuries. However, this Court will not address an issue not squarely and specifically before us for our decision. Following the example of the Supreme Court of Georgia and looking to our own Legislature's reasoning in this area, we adopt the standard as found in our criminal statute, Miss. Code Ann. § 97-3-3, which will permit recovery for the death of a child that is "quick" in the womb. This standard will promote the purpose of our wrongful death statute in preventing the wrongful termination of life. This holding will ensure that all tortfeasors are held accountable for injuries they inflict. Problems with proof and causation are no greater in this type of case than in many other tort claims.

¶34. We have previously confronted and addressed similar issues of "viablity," "individual," "persons," and "living" in the context of the wrongful death statute on at least three prior occasions, i.e., *Rainey* in 1954, *Occhipinti* in 1965, and finally *Davis* in 1998. We are not required, nor do we take a position on

16

the merits of the case. A jury must determine whether or not a wrongful death has occurred, who, if anyone, is the tortfeasor, and finally, whether damages, if any, should be awarded.

¶35. We affirm the trial court's order denying the defendants' motions for partial summary judgment, and we remand this case for further proceedings consistent with this opinion.

¶36. **AFFIRMED AND REMANDED.**

**PITTMAN, C.J., WALLER, EASLEY AND CARLSON, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. COBB, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY EASLEY, J. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**

**COBB, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶37. I concur in the majority's judgment and its conclusion that our wrongful death statute, Miss. Code Ann. § 11-7-13 (Supp. 2002), provides a cause of action for the death of a pre-viable but quick fetus. However, in my view, it would be wiser to choose a point in time which provides more certainty, and thus we should further extend the majority's protection to include a pre-viable fetus from the point of conception. The point designated as "quickening" does not provide such a bright line.

¶38. This question was most recently brought to the attention of the Court in the case of *In re Davis*, 706 So.2d 244 (Miss. 1998), in which this Court extended the scope of *Rainey v. Horn*, 221 Miss. 269, 72 So.2d 434 (1954) to include the beneficiary status of unborn children. However, the *Davis* Court failed to determine the "issue of whether the law would allow recovery for an unborn pre-viable child," leaving that determination "for another day and an appropriate set of circumstances properly raising the question." 706 So.2d at 248. Today that circumstance has been addressed, and yet the problem of "objective determination," which was present in *Rainey* and *Davis* still exists. As Justice Mills noted in his dissent

17

in *Davis,* we cannot objectively determine the moment when a child becomes viable. *Id.* at 249. Similarly, we cannot determine the moment when a child becomes "quick."

¶39. The majority correctly concludes that the present standard for the determination of the word "person" under the statute, that is, whether the unborn child is "viable," is too arbitrary. Maj. Op. ¶ 33. The majority further correctly concludes that because of that arbitrary standard, "an injustice often results when a non viable fetus would have most likely survived, but for the intervening wrongful, tortious conduct of another." *Id.* The majority does not tell us, however, how and why setting the standard to include an unborn child that is "quick"is not also arbitrary. I submit that in the absence of clear statutory language that specifies exactly when an unborn child becomes a "person" or "child," I would, for civil cases, join a growing number of states that hold it is immaterial *when* an unborn child becomes a person. Therefore, I would extend the rights of the unborn to a less arbitrary moment in the life of a human being, that moment being when a separate life begins at conception.

¶40. The majority has correctly pointed to the fact that all jurisdictions now allow recovery for "prenatal injuries when a child is born alive," regardless of the stage of gestation when the injury occurred. Maj. Op. ¶ 13. Furthermore, other states allow for "recovery for a non viable fetus that dies while still in the womb." *Id.* However, though the majority declines to "draw a line at viability," Maj. Op. at ¶ 22, its holding today will result in "drawing a line" where arguably no line can be drawn. While a number of states do not allow for recovery for injuries to an unborn child that result in the birth of a *stillborn* child, this Court has already joined the majority of states that recognize the rights of children *en ventre sa mere. See Davis*, 706 So.2d 244 (Miss. 1998); *Rainey*, 221 Miss. 269, 72 So.2d 434 (1954). In doing so, this Court basically agrees with the proposition that the only *certain* measure of the survival of a child (when the child survives

18

a live birth) is irrelevant, but has sought to protect the interest of the child while still inside the mother's womb. *See Davis,* 706 So.2d at 247 ("To be sure, a determination that "living" commences at birth has the advantage of being a definite, precise, and observable occurrence, while viability is less certain and dependent upon medical technology. Certainty, however, should not be given such overriding concern as to dictate the Court's conclusion in *this* regard.") (emphasis added). Accordingly, whether an unborn child is viable, quick, or unable to be felt by its mother should be immaterial as to whether it may be allowed recovery in a wrongful death action.

¶41. Our previous holdings (as well as the majority's opinion today) require the assistance of medical technology. Even in the stages of life beyond viability, it is sometimes uncertain whether a child can survive on its own unless aided by medically trained personnel. The majority's opinion moves far beyond the "survival science" reasoning, but affixes itself on the arbitrary line of when a fetus is able to move about within the womb. This "movement" may take place from sixteen to eighteen weeks and may depend on a number of relevant factors that are not the same for every woman. *See* Michael Holzapfel, *The Right To Live, The Right To Choose, And the Unborn Victims of Violence Act*, 18 J. Contemp. Health L. & Pol'y 431, 454 (Summer 2002). Georgia is the only state to draw the line at "quickening" and, like the majority, based that line upon its criminal statute. *See Porter v. Lassiter*, 87 S.E.2d 100 (Ga. Ct. App. 1955). That court held that a "fetus becomes a child when it is 'quick' or capable of moving in its mother's womb," *id.* at 102, and reasoned that quickness is a time after conception but before viability. However, that analysis is just as arbitrary as the viability standard. As Justice Mills stated in his *Davis* dissent, "[n]o objective analysis can determine the exact second, minute, hour or day that a particular child may become viable. Our rules should apply equally in all cases and we should defer to, rather than ignore, certainty whenever possible." *Davis*, 706 So.2d at 249 (Mills, J., dissenting).

19

¶42.    As in Georgia, the jury as finders of fact would have to determine *when* "quickening" takes place on a case by case basis. See *Porter,* 87 S.E.2d at 103.  I submit that this Court now has the opportunity to interpret a law that will, in Justice Mills's words, "apply equally in all cases." By extending protection to all unborn children, a jury would only have to determine if the mother was pregnant at the time of the injury. Medical technology, though not advanced enough to tell us exactly *when* a fetus becomes "quick," would certainly be able to determine *if* a mother was pregnant at the time of the injury.

¶43.    The dissent challenges the consistency of the majority's decision to extend the scope of § 11-7-13 with the U.S. Supreme Court's holding in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).  *See* Dis. Op. ¶ 49.  However, without delving deeply into the legal and moral implications of aborting an unborn child, the Supreme Court stated in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 852 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), that "[a]bortion is a unique act," and that "because the liberty of the woman is at stake [it is] in a sense unique to the human condition and so unique to the law." Therefore, the law that governs abortion does not necessarily govern all laws pertaining to unborn children.  Certainly, as the majority noted, other states have interpreted their wrongful death statutes to protect pre-viable fetuses. See Maj. Op. ¶ 13.  The unanimous court in *Farley v. Sartin,* 466 S.E.2d 522, 534 (W. Va. 1995), stated that "[t]he abortion question simply is not relevant to wrongful death."  That court went further to state that:

> while a woman's right to privacy is the policy involved in the abortion decision,
> the policy that a tortfeasor should not escape liability is involved in the wrongful
> death decision.  One decision does not solve the controversy of the other.

*Id*. at 534-35 (quoting Sheryl A. Symonds, *Wrongful Death of the Fetus: Viability is Not a Viable Distinction,* 8 U. Puget Sound L. Rev. 103, 119 (1984)).

¶44.    Justice Cleckley, writing for the West Virginia Supreme Court of Appeals, explained the court's role in determining that the wrongful death statute applied to *all* persons, regardless of development:

> In our judgment, justice is denied when a tortfeasor is permitted to walk away with impunity because of the happenstance that the unborn child had not yet reached viability at the time of death. The societal and parental loss is egregious regardless of the state of fetal development. Our concern reflects the fundamental value determination of our society that life--old, young, and prospective--should not be wrongfully taken away. In the absence of legislative direction, the overriding importance of the interest that we have identified merits judicial recognition and protection by imposing the most liberal means of recovery that our law permits.

*Farley*, 466 S.E.2d at 533.

¶45.    The court in *Wiersma v. Maple Leaf Farms*, 543 N.W.2d 787 (S.D. 1996), comparing the applicability of *Roe* with the South Dakota wrongful death statute, stated:

> Nothing in *Roe* prohibits the Legislature from including a nonviable fetus in its definition of a person under our State's wrongful death act. . . [c]learly, neither physicians nor mothers can be held liable for wrongful death when an abortion is performed with the mother's consent.

*Id.* at 790 n.2. Similarly, interpreting § 11-7-13 to include pre-viable fetuses, does not conflict with the protections of *Roe*.

¶46.    Obviously, interpreting the statute to include all unborn fetuses will create a class that was previously unprotected. More litigation will naturally occur, as those who have lost an unborn child prior to viability will be able to receive compensation for the death of that child. However, this will not open the "can of worms" that the dissent envisions as it envisions litigation that may occur if non-viable fetuses are extended protection under the statute. See Dis. Op. ¶ 61. As the dissent points out, physicians who negligently cause

21

miscarriages to non-viable fetuses would now be held liable for a wrongful death. *Id.* This observation is correct, yet this is not a foreseeable problem, but rather a foreseeable protection against the negligence of physicians. Physicians who now cause injury to, or miscarriage of, viable children are held liable. As a third party, under a pre-viability interpretation, they should also be held liable for any negligence that results in the death of an unborn baby. Physicians would, however, still be afforded protection when performing abortions in accord with *Roe*, in much the same manner as they are protected from criminal prosecution under § 97-3-37(6). Similarly, proponents of keeping the line drawn at viability may conclude that fathers could now sue both doctors and even the mothers of aborted fetuses. This, however, is again addressed under the privacy considerations as set forth by the U.S. Supreme Court in *Roe* and *Casey*. As previously mentioned, abortion is a law unto itself, and, under *Roe*, mothers who wish to abort their pre-viable children, as well as the physicians who perform those procedures, are not held liable for any crime or civil liability.

¶47. A tortfeasor should not be able to walk away with impunity for causing the death of an unborn child not yet quick, while that party would be liable for damages if that child were to survive with grave injuries or even death after birth. It is only logical that the same benefits, afforded not only to children who survive such injuries until after birth but also to those parents whose children die of such injuries, should be extended to the parents of all unborn children.

¶48. Though there are a growing number of jurisdictions that extend protection to unborn children under the wrongful death statute pre-viability, only Georgia has decided to draw the line when the unborn child is "quick." *See Porter*, 87 S.E.2d at 103. The extension to the standard of "quickening" is clearly a compromise that seeks credibility by attaching itself to a criminal statute, but in my view there is a better way. In rejecting the viability standard, this Court should not attempt to draw a bright line where one does not

exist. As the West Virginia court stated "The societal and parental loss is egregious regardless of the state of fetal development. Our concern reflects the fundamental value determination that life --old, young, and prospective-- should not wrongfully be taken away." *Farley,* 466 S.E.2d at 533. Accordingly, I would hold that the wrongful death statute creates a cause of action for the wrongful death of *all* unborn children, viable or pre-viable, and regardless of movement. On that basis, I concur in this Court's judgment affirming the trial court's order and remanding this case for further proceedings.

**EASLEY, J., JOINS THIS OPINION.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶49. The majority's holding is all but the adoption of the conception theory. The holding, which allows recovery for the wrongful death of a "quickened" fetus, goes too far. One has to question the nature behind the majority's opinion as an attempt to limit and even do away with *Roe v. Wade*. The majority's holding will no doubt cause waves with existing civil and criminal law and in particular *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The majority fails to honor precedent concerning "viability" and instead chooses to create new law which will not doubt have negative effects. Having found the majority's holding unnecessary and troublesome, I dissent.

¶50. In 1808, the Legislature authorized wrongful death actions for "injuries producing death." *Ill. Cent. R. Co. v. Fuller*, 106 Miss. 65, 63 So. 265, 268 (1913). The test for wrongful death recovery concerning the death of a fetus has long been established to be "viability." *Terrell v. Rankin*, 511 So.2d 126 (Miss. 1987); *Rainey v. Horn*, 221 Miss. 269, 72 So.2d 434 (1954). We define viability as "when the destruction of life of [the fetus'] mother does not necessarily mean the end of its life also, and when if separated from its mother would be so far a matured human being that it would live and grow mentally and

23

physically." ***Rainey***, 221 Miss. at 283, 72 So.2d at 440. Reasons for allowing recovery for the negligent death of a viable fetus include: "(1) an unborn viable child is capable of independent existence, hence should be regarded as a separate entity; (2) if the law recognizes an unborn child sufficiently to protect its property rights and rights of inheritance and protects it against the crimes of others, it should recognize its separate existence for the redressing of torts; (3) if no right of action is allowed, there is a wrong inflicted for which there is no remedy and (4) natural justice." ***Id.*** at 281*,* 72 So.2d at 439. For 49 years this precedent has been in place and upheld by this Court. There is no justification for the majority's abrupt change of view which hereafter creates wrongful death rights for the death of an unborn fetus in the first trimester of pregnancy.[2]

¶51.    The majority justifies its change in position by asserting that the Legislature enacted wrongful death statutes to address the common law rule which denied recovery for prenatal injuries as discussed in ***Dietrich v. Inhabitants of Northhampton***, 138 Mass. 14 (1884). This is flagrantly misleading. In 1808, our Legislature authorized actions for wrongful death. See ***Fuller***,  63 So. at 268. If you do the math you will see that our State's wrongful death statute was enacted 76 years before ***Dietrich***. Therefore, it is not an accurate statement of the law to assert that our State's wrongful death statute was enacted to address the "harsh results of the common law rule" as asserted by the majority.

¶52.    The majority also places much emphasis on holdings which allow non-viable fetuses to recover under the wrongful death statute for the death of an heir. See ***Childs v. General Motors Corp.***, 73 F. Supp. 2d 669 (N.D. Miss. 1999); ***In re Davis***, 706 So.2d 244 (Miss. 1998). Allowing a non-viable fetus to recover for the death of a parent of sibling under the wrongful death statute is wholly distinguishable from

---

[2] The majority did not even overrule these cases.

24

allowing wrongful death recovery for the death of a non-viable fetus. They are two distinct issues. The wrongful death statute was intended to provide compensation to those who have suffered a loss usually of a family member upon whom they relied for support. It is inherent in the purpose of the wrongful death statute, that a non-viable fetus, who is the natural child of the deceased and who would have relied on the deceased for support, be compensated for that loss of support, whether it be financial or emotional.

¶53.    The majority also cites to *McGowan v. Estate of Wright*, 524 So.2d 308 (Miss. 1988), in making the ambiguous statement that "the purposes of the wrongful death statute are to prevent the wrongful termination of life and provide the beneficiary with compensation for the loss of companionship and society of the deceased, the pain and suffering of the deceased between injury and death, and punitive damages.... We decline to draw a line at viability." Maj. Op. ¶ 22. First of all, *McGowan* addressed the wrongful death claim of a widow who lost her elderly husband in an auto accident. *Id.* at 309. *McGowan* does not speak about viability. In fact, after reviewing the opinion, the only statements made, which would in some way support the statement made by the majority, are found in Justice Robertson's dissent from denial of petition for rehearing which is on page 311 through 313 of the opinion. *Id.* at 311-13.

¶54.    Next, the majority finds support for its holding by relying on our State's criminal statutes. The majority maintains that its holding creates "consistency" with criminal statutes of this state, specifically Miss. Code Ann. § 97-3-37 which provides for the charge of manslaughter for "the killing of an unborn quick child, by an injury to the mother of such child, which would be murder if it resulted in the death of the mother." *See also* *Willis v. State*, 518 So.2d 667 (Miss. 1988); *Sitton v. State*, 760 So.2d 28 (Miss. Ct. App. 1999). We have never strived to provide for "consistency" between criminal and civil actions. Criminal and civil actions are too distinct to ever provide "consistency." In so holding, the majority seems

25

to insinuate that "consistency" is the goal of this Court. If that is so, then should we now provide for the same burdens of proof or discovery rules for criminal and civil actions? The majority's holding also will have sweeping implications in criminal law. In defining "quick child," the majority relies on *Willis*, 518 So.2d at 668. *Willis* concerned whether there was sufficient evidence to support a conviction of manslaughter in the death of an unborn fetus. *Id.* at 668. The defendant argued that there was insufficient evidence to show that the unborn fetus was "quick" within the meaning of the manslaughter statute. *Id.* In addressing the defendant's claim we defined "quick child" for the purpose of the manslaughter statute. *Id.* The majority, by now adopting the same definition as that of the manslaughter statute, has quit frankly not only made someone who otherwise would only have possibly been found civilly liable for the death of an unborn fetus, now also susceptible to criminal punishment. It's not that hard a leap for an ambitious prosecutor to make, particularly to outrightly stop all abortion by doctors in this state. Further, if a doctor was negligent in treating a pregnant mother and causes the mother to abort this may lead to charges of manslaughter.

¶55.    Additionally, the majority in making its holding relies heavily on Georgia precedent which allows for wrongful death actions for the death of a "quick fetus." See *Shirley v. Bacon*, 267 S.E.2d 809 (Ga. Ct. App. 1980); *Tucker v. Howard L. Carmichael & Sons, Inc*., 65 S.E.2d 909 (Ga. 1951); *Porter v. Lassiter*, 87 S.E.2d 100 (Ga. Ct. App. 1955) . This would be justified if our State did not already have precedent on the issue. We have already held that the test for  the maintenance of a wrongful death action for the death of a fetus is "viability." *Terrell*, 511 So.2d 126; *Rainey*, 221 Miss. 269, 72 So.2d 434. We do not need to consider Georgia precedent, because we have our own precedent.

¶56.    Next, the majority delves into the issue of medical proof to determine whether a child is "quick" in the womb. The majority correctly states that photographic evidence, the testimony of a forensic pathologist,

and the testimony of a medical doctor will all be appropriate offers of proof. See *Brandon HMA, Inc. v. Bradshaw*, 809 So.2d 611 (Miss. 2001);*Pittman v. Hodges*, 462 So.2d 330 (Miss. 1984);*Sitton*, 760 So.2d 28. However, proof of "quickening" is much more difficult than proof of "viability." The majority defines "quickening" as "a child 'that has developed so that it moves within the mother's womb.' " quoting Black's Law Dictionary, 1415 (4th ed. 1968). Any doctor will tell you that fetal movement does not occur at the exact same time for every fetus. It is not uncommon for one woman who is three months pregnant to have some fetal movement, while another woman who is five and one half months pregnant to have felt little to no fetal movement. This inconsistency was even recognized by the United States Supreme Court in *Roe*, 410 U.S. at 132-33. The concurring opinion also recognizes that the majority fails to adopt an "objective" standard which would "draw a line" at to when "quickening" occurs. Under the majority's "quickening" test, any wrongful death action concerning a fetus will certainly turn into a battle of the experts.

¶57.    Finally, the majority states that its holding today does not have any implications or inconsistency with the United States Supreme Court's decision in *Roe.* How can the majority's holding not implicate the holding in *Roe*? Under the holding in *Roe*, prior to the end of the first trimester of pregnancy a physician and patient are free to make a determination without state interference that termination of a pregnancy is appropriate and necessary. *Id.* at 164, 93 S.Ct. at 732. The first trimester of pregnancy encompasses conception up to the thirteenth (13th) week of pregnancy. As discussed above, some women experience movement or "quickening" within the first trimester. Under the majority's holding, a father who is unaware and does not consent to his wife's abortion, may now institute a wrongful death action for the death of his "quickened" fetus. Additionally, under the majority's definition of "quick child," a physician may now be held

27

liable not only in tort for the abortion of a "quick child," but also through criminal indictment and prosecution. Furthermore, a father and mother, who before were limited to a suit only for their personal damages when a physician may have negligently caused the miscarriage of their "quickened" and "non-viable" child, now can also maintain an action for the wrongful death of the child. See *Occhipinti v. Rheem Mfg. Co.*, 252 Miss. 172, 172 So.2d 186 (1965).[3] Two separate and distinct actions to recover for their injuries. If the public thinks this State's physician climate is bad now, just wait till the lawsuits really start taking off.

¶58.    The very problems implicated by the majority's holding were recently discussed in a *San Francisco Chronicle* article concerning the Peterson murder case in California. The article states that:

> Momentum is building behind legislation that would make it a federal crime to harm the fetus of a pregnant woman, spurred in part by outrage over the slaying of Laci Peterson and her unborn son, Conner.
>
> The measure, dubbed the "Laci and Conner's Law," seeks to treat fetuses in such cases as victims separate from their mothers, with all the rights of individuals. It would apply to federal crimes, which take place in areas such as national parks, military installations, and Indian reservations, and would carry a sentence of up to life imprisonment. . . .
>
> While the legislation may affect the outcome of only a handful of trials each year – Peterson is charged under state law – it has symbolic significance for anti-abortion advocates, who have tried to pass the measure but have encountered resistance in the Senate and the White House. . . .
>
> Supporters of the Peterson bill say it is only right that the federal government recognize the loss of an unborn child. Under the law, federal prosecutors treat such crimes as an assault on the mother, with the option of enhancing the penalty. . . .

---

[3] In *Occhipinti v. Rheem Mfg Co.*, 252 Miss. 172, 172 So.2d 186 (1965), this Court held that the heirs of a five and one-half month old fetus could not maintain an action for wrongful death for a miscarriage caused by an auto accident. However, in upholding the mother's right to proceed with a personal injury action resulting from her own injuries, the Court stated that "the trial court erred in excluding from the consideration of the jury the effects upon the mother of the death of her unborn child."

> But opponents say the legislation would subvert a woman's right to choose, by giving even recently fertilized cells the same rights as a child outside the womb. "The real purpose of the law is to define a fetus at any stage of development as a person," said Rep. Jerrold Nadler, D-N.Y. "That undermines *Roe v. Wade*."

Juliet Eilperin, *Peterson Slaying Spurs Move to Treat Fetus as Separate Victim; Some Fear It Will Be Used to Attack Roe v. Wade*, S.F. Chron., Sunday, July 20, 2003, at A4.

¶59.    There can be no doubt that the holding of the majority has implications on other aspects of our civil and criminal justice system. Only a couple of examples are necessary to illustrate my point. Torts against "persons" will now be extended to cover "quickened" fetuses. A "quickened" fetus as a "person" will be allowed to maintain a tort action for assault and/or battery. The fetus's claim will be separate and distinct from the claim of its mother, father, and siblings. See *Occhipinti*, 252 Miss. 172, 172 So.2d 186. Additionally, crimes against "persons" will now be extended to cover "quickened" fetuses. It is now possible for a defendant to be guilty of assaulting not only a mother, but also her "quickened" fetus as it is also a person. A blow to the stomach of a pregnant woman could lead to two assault charges. One for assaulting the mother and the second for assaulting the child.

¶60.    Another problem exhibited in the majority's holding is that there is no language which states that the Court is specifically overruling past precedent which formerly adopted and applied the test of "viability." If the majority is intending to make new law, then it needs to be more explicit with its holding.

¶61.    In sum, the majority has without justification decided to change well-established law in this State. One can only wonder where its true motives lie in making such a decision. The majority's holding will no doubt open a whole new can of worms creating much confusion and ambiguity as to the ultimate implications of the holding. For these reasons, I dissent.