613 So.2d 1241 (1993)
Melvin GENTRY and Kathleen Gentry
v.
Dr. Keith GILMORE.
1910254.
Supreme Court of Alabama.
January 29, 1993.
Rehearing Denied March 5, 1993.
*1242 Shay Samples and Ronald R. Crook of Hogan, Smith, Alspaugh, Samples & Pratt, P.C., Birmingham, for appellants.
Michael K. Beard and W. Hill Sewell of Starnes & Atchison, Birmingham, for appellee.
PER CURIAM.
This case involves the alleged wrongful death of a 13-week fetus. The first legal question presented is whether the trial court erred in refusing to instruct the jury, in substance, that the father could sue for the wrongful death of the fetus and that the viability of the fetus at the time of the injury was irrelevant.[1] Because we conclude that the Wrongful Death Act does not provide a cause of action for the death of a nonviable fetus, we hold that the trial court did not err in refusing to instruct the jury as requested. The second question is whether the trial court abused its discretion in not allowing the plaintiffs to present certain testimony of an expert witness. We hold that it did not. Therefore, we affirm the judgment based on a jury verdict in favor of the defendant physician. Our holding is consistent with our decision in Lollar v. Tankersley, 613 So.2d 1249 (Ala.1993), which involved substantially the same question.

FACTS
Melvin and Kathleen Gentry, husband and wife, sued Keith Gilmore, M.D., after he performed a dilatation and curettage (D & C) on Mrs. Gentry. Mr. Gentry sought damages for the wrongful death of a 13-week fetus, and Mrs. Gentry sought damages for her pain and discomfort, mental anguish, and emotional distress. The Gentrys appeal from a judgment based on a jury verdict in Dr. Gilmore's favor on both counts.
Dr. Gilmore first examined Mrs. Gentry on August 5, 1983, when she was admitted *1243 to East End Hospital in Birmingham complaining of flooding blood, passing clots, and cramping. Dr. Gilmore performed the D & C on August 6. An ultrasound test on August 8 revealed an apparently normal 11-week fetus. Mrs. Gentry miscarried on August 24. It is undisputed that, at the time of the miscarriage, the 13-week fetus was not viable, that is, it was not capable of living outside the womb.
Dr. Neil Wolfson, an obstetrician and gynecologist, testified at trial that Mrs. Gentry exhibited the classical signs of pregnancy at the time of her admission (tiredness, nausea, cramps, spotting); that her urine test was positive for pregnancy; and that a pelvic examination would have revealed that she was pregnant. Dr. Wolfson further testified that Dr. Gilmore should have ordered an ultrasound test before performing the D & C; that if he had done so, he would not have performed the D & C, which, Dr. Wolfson testified, in all medical probability contributed to the miscarriage; and that the ultrasound test would have revealed that Mrs. Gentry was experiencing only a threatened abortion, a pregnancy with bleeding, which is treated with medication and bed rest.
Dr. Gilmore testified that he did not perform an ultrasound test before he performed the D & C because he had diagnosed an inevitable abortion, meaning that the fetus would have died even had he not performed the D & C. He maintained that an ultrasound test was unnecessary.[2] He based his diagnosis of an inevitable abortion on the fact that Mrs. Gentry was bleeding and that her cervix was dilated, which indicated that the fetus was not living.
The Gentrys presented Dr. Robert Eichelberger, the radiologist who interpreted the ultrasound test on August 8 after the D & C, to rebut Dr. Gilmore's testimony regarding the availability of an ultrasound test during the weekend of August 6-7 and his testimony that Mrs. Gentry was suffering an inevitable abortion when he performed the D & C. The trial court did not allow the testimony.
The Gentrys argue that the question of the fetus's viability at the time of death is irrelevant to recovery, and that the refusal of their proposed instructions regarding the right to maintain an action for the wrongful death of a fetus was reversible error. The issue presented, therefore, is whether the trial court's refusal to instruct the jury as requested was reversible error.

I
The Alabama Wrongful Death Act permits the father, or in some cases, the mother or personal representative, to bring an action for the wrongful "death of a minor child." Ala.Code 1975, § 6-5-391. (Emphasis added.) The right thus conferred by the statute provides a remedy in certain factual situations in which the injury causing the death is inflicted before the child is born.
This Court, in Huskey v. Smith, 289 Ala. 52, 265 So.2d 596 (1972), considered whether a cause of action existed if the injury causing the death occurred before the child was born. In that case, this Court, following precedents from other jurisdictions, overruled Stanford v. St. Louis-San Francisco Ry., 214 Ala. 611, 108 So. 566 (1926), and allowed an action for the death of a child who was born alive but who died of injuries allegedly suffered while still in his mother's womb, but while viable. Huskey, 289 Ala. at 55-56, 265 So.2d at 598. Similarly, this Court has also recognized a cause of action when a child is born alive but dies of injuries suffered before becoming viable. See Wolfe v. Isbell, 291 Ala. 327, 333-34, 280 So.2d 758, 764 (1973). In Eich v. Town of Gulf Shores, 293 Ala. 95, 97, 300 So.2d 354, 355 (1974), this Court answered the question whether the child must be born alive, in holding that Alabama recognizes a cause of action for the *1244 wrongful death of a stillborn fetus that died of injuries suffered while viable.
In Huskey, Wolfe, and Eich, the deaths admittedly occurred after the fetus had attained viability. This case involves an alleged injury to a nonviable fetus and the death of that fetus before the fetus became viable. We follow the reasoning of a majority of jurisdictions and hold that our statute provides no cause of action for the wrongful death of a nonviable fetus. In so holding, we point out that, with the exception of Georgia, the Gentrys' position apparently is not the law in any American jurisdiction where there is no clear legislative direction to include a nonviable fetus within the class of those covered by the wrongful death acts. See Miccolis v. AMICA Mutual Insurance Co., 587 A.2d 67, 71 (R.I.1991); Gary A. Meadows, Comment, Wrongful Death and the Lost Society of the Unborn, 13 J.Legal Med. 99, 107 (1992); and Sheldon R. Shapiro, Annotation, Right to Maintain Action or to Recover Damages for Death of Unborn Child, 84 A.L.R.3d 411, 453-54, § 5[a] (1978 & Supp. 1992). The Georgia courts do not require viability at the time of death, but the fetus nevertheless must be "quick," i.e., able to move in the mother's womb. Porter v. Lassiter, 91 Ga.App. 712, 87 S.E.2d 100, 103 (1955).
During the 20 years since Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the viability distinction has gained significance. In its most recent decision in the Roe line of cases, the United States Supreme Court drew the line at viability for purposes of determining when a woman has a right to choose an abortion. Planned Parenthood v. Casey, ___ U.S. ___, ___, 112 S.Ct. 2791, 2816, 120 L.Ed.2d 674, 710 (1992).
Based on the foregoing, we hold that the term "minor child" in § 6-5-391 does not include a fetus that dies before becoming able to live outside the mother's womb. Therefore, the trial court did not err in refusing to instruct the jury as requested by the Gentrys. Blair v. St. Margaret's Hospital, 285 Ala. 636, 640, 235 So.2d 668, 671 (1970).

II
We now address whether the trial court should have permitted Dr. Eichelberger to testify in rebuttal that an ultrasound test would have been available at East End Hospital during the weekend; that the fetus was alive at the time of the ultrasound test; and that Mrs. Gentry was not suffering an inevitable abortion at the time of the D & C. Because we hold that a wrongful death action is unavailable in this case, we address this issue only insofar as Mrs. Gentry's claims are concerned.
A plaintiff has a right to introduce rebuttal evidence, Charles W. Gamble, McElroy's Alabama Evidence § 433.01 (4th ed. 1991), but the trial court has wide discretion in deciding whether to admit the testimony if it does not strictly rebut other evidence. Cahaba Valley Development Corp. v. Nuding, 512 So.2d 46, 49 (Ala. 1987). The trial court also has discretion to admit or to exclude cumulative evidence. See, e.g., Alabama Power Co. v. Wallace, 548 So.2d 1372, 1376 (Ala.1989); Gamble, supra, at § 10.07.
Because Dr. Gilmore admitted at trial that an ultrasound test would have been available over the weekend, Dr. Eichelberger's testimony in this respect technically would not have been in rebuttal, and would, in part, have been cumulative. Regarding whether the ultrasound test indicated any abnormality with Mrs. Gentry or with the fetus, Dr. Wolfson had already given testimony consistent with that to be given through Dr. Eichelberger. Also, in response to the trial court's question outside the presence of the jury, Dr. Eichelberger admitted that the ultrasound test would not have conclusively indicated whether an abortion was in progress. Considering these factors, the trial court did not abuse its discretion in refusing to permit the testimony in this particular case.
Based on the foregoing, we affirm the judgment of the trial court based on the *1245 jury verdict in Dr. Gilmore's favor on the claims of both Mr. and Mrs. Gentry.
AFFIRMED.
HORNSBY, C.J., and SHORES, ADAMS, STEAGALL and INGRAM, JJ., concur.
ALMON and HOUSTON, JJ., concur in the result.
MADDOX, J., dissents.
HOUSTON, Justice (concurring in the result).
I concur with Justice Merrill's dissent (concurred in by Justices Coleman, Harwood, and McCall) in Eich v. Town of Gulf Shores, 293 Ala. 95, 100-01, 300 So.2d 354, 358-59 (1974). Therefore, I would vote to overrule Eich v. Town of Gulf Shores and would hold that if the child is not born alive then there is no liability for causing the wrongful death of that child. This is consistent with the criminal law. To convict a person of homicide, the victim must be "a human being who had been born alive at the time of the homicidal act." Ala.Code 1975, § 13A-6-1(2). This, I believe, is consistent with the common law. See § 13A-6-1 commentary. There should not be different standards in wrongful death and homicide statutes, given that the avowed public purpose of the wrongful death statute is to prevent homicide and to punish the culpable party and not to compensate for the loss. This does not mean that the mother could not be compensated for the injury she receives.
MADDOX, Justice (dissenting).
My colleagues conclude that the words "minor child" in Alabama's Wrongful Death Act, Ala. Code 1975, § 6-5-391, are not broad enough to include a nonviable fetus. Admittedly, a majority of jurisdictions requires, in the absence of specific legislative direction, that the fetus have attained viability before the death occurs in order for a cause of action for wrongful death to be permitted.
I must respectfully disagree with that legal conclusion, because I believe that construing the words "minor child" to include a nonviable fetus would: (1) promote the purpose of the wrongful death statute, which is to prevent the wrongful termination of life, even potential life; (2) facilitate the legislature's intent to protect nonviable fetal life, as expressed in other statutes concerning abortion and fetal deaths; and (3) be logically consistent with prior decisions of this Court that have, in my opinion, rejected what I believe are artificial distinctions based on viability and live birth as conditions for recovery.
In short, I believe that the public policy of the State, as expressed in various legislative enactments, is to protect the potentiality of life. I further believe that when the interests of the mother and father in preserving the life of an unborn child are congruent with the interest of the State, as expressed in its legislation, the legislature intended to protect the potentiality of human life, and I believe that the legislature intended that the term "minor child" in the Wrongful Death Act include a nonviable fetus. My interpretation of Alabama's statute would allow for the recovery of "such damages as the jury may assess," § 6-5-391, in all cases where the interest of the mother and father of the nonviable fetus were congruent with that of the State. It would not cover, of course, the death of a nonviable fetus in instances where the death of the nonviable fetus resulted from the mother's exercise of her constitutional rights, as those rights have been interpreted by the United States Supreme Court.
The underlying purpose of Alabama's Wrongful Death Act is "to protect human life; to prevent homicides by wrongful act, omission or negligence of persons and corporations, their agents and servants; and to stimulate diligence in the protection of the natural right to live, without respect to the personal condition or disability of the person so protected." Breed v. Atlanta B. & C.R. Co., 241 Ala. 640, 642, 4 So.2d 315, 316 (1941) (emphasis added). The right to maintain an action for wrongful death, for adults or minors, did not exist at common law; consequently, at common law, it was cheaper to kill a person than to injure him. W. Page Keeton, et al., *1246 Prosser and Keeton on the Law of Torts § 127, at 945 (5th ed. 1984). Because of this common-law rule, legislatures enacted wrongful death statutes to correct what was considered to be an intolerable result. Id.
My colleagues, in distinguishing between viability and nonviability of the fetus as a condition for the application of Alabama's Wrongful Death Act, necessarily resurrect the same distinctions that led to the adoption of wrongful death statutes in the first place. Furthermore, in holding that the legislature did not intend to protect the potential of human life in cases where the fetus is determined to be nonviable because a nonviable fetus is not a "minor child" within the meaning of § 6-5-391, my colleagues fail to promote the very purpose of Alabama's Wrongful Death Act, that is, the protection of life, including that of a nonviable fetus, by authorizing the recovery of such damages as the jury may assess.[3] Because I believe that the beneficent purpose of the Wrongful Death Act is to protect human life and believe that the legislature intended to cover the potentiality of human life, I would attribute to the legislature an intent to give the words "minor child" a broad definition in situations involving fetal injury resulting in death, and I would further hold that the question of viability of the fetus at the time of death is irrelevant and immaterial, as the Gentrys argue on this appeal.
In construing the word "person" in a precursor to another section of the Wrongful Death Act, Ala. Code 1975, § 6-5-410, this Court noted:
"This statute contains no qualifying clauses, limiting its remedial provisions to any class or classes of persons, or excluding any class from its wholesome terms. It employs the word person in its broadest sense, and it would seem that every being falling within that general designation may take shelter under its protecting wings."
South & North Alabama R.R. v. Sullivan, 59 Ala. 272, 279 (1877).
It appears to me that the same can be said for the words "minor child," because Alabama's statute focuses on the defendant's conduct, not upon whether the deceased could or could not have maintained an action. Cf. Breed v. Atlanta, B. & C.R. Co., 241 Ala. 640, 4 So.2d 315 (1941) (wrongful death action permitted, even though a prisoner had lost his own personal right to sue).
To deny a cause of action rewards tort-feasors who inflict fatal injuries upon nonviable fetuses, by allowing them to escape liability based upon what I think is an artificial distinction that focuses more on the status of the life that has been wrongfully terminated than upon the wrongful conduct that caused the death. Such a holding produces an anomalous result. Under the holding of the Court, if a tort-feasor inflicts injuries upon a nonviable fetus that are not fatal, the tort-feasor can be held liable for those injuries, see, e.g., Eich v. Town of Gulf Shores, 293 Ala. 95, 97, 300 So.2d 354, 355 (1974); Wolfe v. Isbell, 291 Ala. 327, 330, 280 So.2d 758, 761 (1973), but if the injuries and the death occurred before the fetus was viable, no action exists. I believe that interpretation to be incorrect. It produces just the type of unjust result that wrongful death statutes were enacted to prevent.
My colleagues' holding that the legislature never intended that the term "minor child" include a nonviable fetus is based, at least in part, on the holdings in the landmark cases of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Planned Parenthood v. Casey, ___ U.S. ___, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). In Roe, the United States Supreme Court did address the question of when the State's interest in protecting fetal life must yield to a woman's right to abort the fetus. Roe and other decisions of the United States Supreme Court have focused on the right of a mother to terminate a pregnancy, even though the policy of the State was to protect all life. Those cases do not involve the question whether the State can *1247 protect the potentiality of human life when the mother is not seeking to claim a constitutional right of privacy, but, on the contrary, is seeking to recover damages for the alleged wrongful termination of potential human life. In Roe, the Court, while recognizing the constitutional right of a woman to terminate a pregnancy in certain circumstances, nevertheless also recognized that the State has an "important and legitimate interest in protecting the potentiality of human life," Roe, 410 U.S. at 162-63, 93 S.Ct. at 731, 35 L.Ed.2d at 182, which must be balanced against a woman's right of privacy, including the limited right to choose an abortion, Roe, 410 U.S. at 153, 93 S.Ct. at 727, 35 L.Ed.2d at 177, at least until the point of viability. See Casey, ___ U.S. ___, ___, 112 S.Ct. 2791, 2816-17, 120 L.Ed.2d 674, 710 (1992).
My colleagues seem to believe that Roe somehow would prevent recovery here. I do not think so. Roe and its progeny address the potential conflicts between a woman's right to an abortion and the State's interest in the woman's health and the fetus's life. Roe is not implicated when, as in this case, both the State and the mother have congruent interests in preserving life and punishing its wrongful destruction. I conclude that the legislature has a right to protect nonviable fetal life when its interest is congruent with that of the mother, and I will list the reasons why I reach this conclusion.
The legislature has not clearly defined "minor child," but neither has the legislature amended the statute after this Court's decisions in Huskey, Wolfe, and Eich. The legislature has, however, on several occasions, expressed its intent to protect fetal life without regard to viability. For example, this Court noted in Eich that former Ala. Code 1940, Tit. 22, § 24 (Recomp.1958), much like Ala. Code 1975, § 22-9A-13(a), required registration of death certificates for fetal deaths occurring at or beyond 20 weeks, although, as Dr. Wolfson testified in this case, the fetus would not be viable at 20 weeks of age. The statute "is expressive of a public interest in fetal deaths." Eich, 293 Ala. at 100, 300 So.2d at 358.
Even more significant is the fact that the Alabama legislature, when it adopted the 1975 Code, brought forward a statute, which had been a part of the Alabama codes since 1852, making it a misdemeanor for a person to willfully induce or attempt to induce any abortion, miscarriage, or premature delivery of a woman, unless to preserve her life or health. Ala. Code 1975, § 13-8-4; now, Ala. Code 1975, § 13A-13-7. By not providing for any distinction based on fetal age or development, the Legislature changed the common law offense, which was restricted to cases in which the child was "quick." Smith v. Gaffard, 31 Ala. 45, 51 (1857). In this way, the legislature has, for more than 140 years, expressed its interest in protecting all fetal life; consequently, I think that my colleagues have failed to appreciate the fact that the public policy of this State has been to protect the potentiality of human life, and that this policy should be enforced as long as it does not conflict with what the United States Supreme Court has determined to be the privacy rights of the mother. The strength of the legislature's resolve is illustrated by the fact that this misdemeanor statute was readopted after the United States Supreme Court had effectively declared such statutes unconstitutional in Roe v. Wade.[4]
As further proof of the public policy of this State, I note that in 1987 the legislature adopted Alabama's Parental Consent Act, Ala. Code 1975, §§ 26-21-1 through 26-21-8, which in most cases requires that, before performing an abortion upon an unemancipated minor, a person must obtain either a parent's written consent or a judicial waiver. See § 26-21-3(a). I recognize that these statutes, when balanced against a woman's right to abort a fetus, may be declared unconstitutional, but it is quite *1248 apparent to me that Alabama, at present, seeks to protect fetal life, and I do not see how Roe or its progeny are implicated when the mother's choice is not in conflict with the State's policy, but, in fact, is congruent therewith.
I also disagree with my colleagues' analysis of Wolfe and Eich. I read the essential holdings of Wolfe and Eich to be that viability at the time of injury and live birth are irrelevant to recovery; consequently, I believe those holdings support my conclusion that Mr. Gentry was entitled to have the jury instructed specifically as he requested.[5]
In Wolfe, this Court discussed the significance of viability, extensively reviewing decisions of other courts and noting that the more recent authorities did not require viability at the time of injury. Wolfe rejected such a distinction, partly because, it said, "the fetus is just as much an independent being prior to viability as it is afterwards, and ... from the moment of conception, the fetus or embryo is not a part of the mother, but rather has a separate existence within the body of the mother." Wolfe, 291 Ala. at 330-31, 280 So.2d at 761. Although I did not participate in the decision in Wolfe, I agree with the rationale the Court used in that decision.
I recognize that, for various reasons, most jurisdictions do not yet consider a nonviable fetus to be protected by wrongful death statutes. However, in my own research I discovered that the overwhelming majority of commentators has criticized distinctions based on viability of the fetus, for a number of reasons: A child is an entity, a "person," from the moment of conception, 1 Stuart M. Speiser, et al., Recovery for Wrongful Death and Injury § 4.37, at 204 (3rd ed. 1992); the first trimester is the developmental period in which the fetus is most susceptible to environmental influences, David A. Gordon, The Unborn Plaintiff, 63 Mich.L.Rev. 579, 589 (1965); viability is not determinative or relevant to the question of the tort-feasor's ability to escape liability, David Kader, The Law of Tortious Prenatal Death Since Roe v. Wade, 45 Mo.L.Rev. 639, 659-60 (1980); tort-feasors should not be better off if the fetus dies from injuries sustained before viability than they would be if the fetus lives, Frank J. Hartye, Comment, Tort Recovery for the Unborn Child, 15 J.Fam.L. 276, 297 (1976-77); "[p]otential life is no less potential during the first weeks of pregnancy than in the last weeks, and a fetus is entitled to develop without outside interference," Michael P. McCready, Comment, Recovery for the Wrongful Death of a Fetus, 25 U.Rich. L.Rev. 391, 405 (1991); viability distinctions impede the goals of the wrongful death statutes, Gary A. Meadows, Comment, Wrongful Death and the Lost Society of the Unborn, 13 J.Legal Med. 99, 114 (1992); viability should not be the point at which the unborn gain legal protection, because "viability is dependent upon a number of factors, including the weight and race of a fetus, maternal age and health, nutritional deficiencies and psychological elements," Patricia A. Meyers, Comment, Wrongful Death and the Unborn Child: A Look at the Viability Standard, 29 S.D.L.Rev. 86, 96-97 (1983); "the actual medical determination of the point at which a fetus attains viability is uncertain," Karen Rene Osborne, Comment, TortsThe Right of Recovery for the Tortious Death of the Unborn, 27 How.L.J. 1649, 1661 (1984); a viability standard results in an injustice, because a negligently injured, nonviable fetus probably would have survived but for the wrongful act, Janet I. Stich, Comment, Recovery for the Wrongful Death of a Viable Fetus: Werling v. Sandy, 19 Akron L.Rev. 127, 138 (1985); "viability is as arbitrary a standard in wrongful death cases as was birth," Sheryl Anne Symonds, Comment, Wrongful Death of the Fetus: Viability Is Not a Viable Distinction, 8 U.Pug. Sound L.Rev. 103, 115 (1984); and viability is "[w]ithout a compelling evidential or medical justification" and is "an artificial barrier to wrongful death recovery," *1249 Richard E. Wood, Comment, Wrongful Death and the Stillborn Fetus: A Common Law Solution to a Statutory Dilemma, 43 U.Pitt.L.Rev. 809, 835 (1982).
In Eich, which involved injury to a viable fetus, this Court also rejected live birth as a condition for recovery, because, based on the recognition of the cause of action under Huskey and Wolfe fact situations:
"To deny recovery where the injury is so severe as to cause the death of a fetus subsequently stillborn, and to allow recovery where injury occurs during pregnancy and death results therefrom after a live birth, would only serve the tortfeasor by rewarding him for his severity in inflicting the injury. It would be bizarre, indeed, to hold that the greater the harm inflicted the better the opportunity for exoneration of the defendant. Logic, fairness and justice compel our recognition of an action, as here, for prenatal injuries causing death before a live birth."
Eich, 293 Ala. at 97, 300 So.2d at 355 (footnote omitted). Thus, under principles established in Wolfe and Eich, neither viability at the time of injury, nor live birth, is a prerequisite to recovery for the wrongful death of a fetus.
These same principles are no less compelling when both the injury and the death occurred before viability. As the above-cited commentators and others have noted, viability is an arbitrary, artificial, and varying standard that is illogical when considered against this Court's recognition in Wolfe of the biological separateness of mother and child from the moment of conception.
Based on the foregoing, I believe that the trial court should have instructed the jury on the applicable law, as stated in the proposed instructions[6] numbers 1, 3, 4, 5, and 6, and that its refusal to do so was prejudicial. I must respectfully dissent.
NOTES
[1] The Gentrys cited Eich v. Town of Gulf Shores, 293 Ala. 95, 300 So.2d 354 (1974), as authority for these proposed instructions, which the trial court refused:

"PLAINTIFFS' REQUESTED JURY CHARGE NO. 1
"The law in Alabama provides for the authority for the father to bring an action for the wrongful death of an unborn fetus. It is not necessary that the fetus be born alive in order to be able to recover. The viability of the fetus at the time of the alleged injury is not necessary and not relevant or material. Viability refers to the ability of the fetus to survive outside the mother's womb on its own. Thus, in order to be legally entitled to recover in a wrongful death action for the wrongful death of an unborn fetus, the plaintiff must prove to your reasonable satisfaction the following: (1) That the fetus was alive at the time of the alleged negligence, or breach of the standard of care; (2) That the death of the fetus was proximately caused by the alleged negligence of the defendant. Proximate cause of an injury is that cause which in the natural and probable sequence of events, and without the intervention of any new or independent cause, produces the injury and without which such injury would not have occurred."
"PLAINTIFFS' REQUESTED JURY CHARGE NO. 2
"A live fetus is a `person' under the terms and within the meaning of the Alabama Wrongful Death Statute."
"PLAINTIFFS' REQUESTED JURY CHARGE NO. 3
"The law in Alabama provides the authority for the father to bring an action for the wrongful death of an unborn fetus."
"PLAINTIFFS' REQUESTED JURY CHARGE NO. 4
"Under Alabama law, it is not necessary that the fetus be born alive in order to be able to recover."
"PLAINTIFFS' REQUESTED JURY CHARGE NO. 5
"The viability of the fetus at the time of the alleged injury is not necessary and not relevant or material. Viability refers to the ability of the fetus to survive outside the mother's womb on its own."
"PLAINTIFFS' REQUESTED JURY CHARGE NO. 6
"In order to be legally entitled to recover in a wrongful death action for the death of an unborn fetus, the plaintiff must prove to your reasonable satisfaction the following: (1) That the fetus was alive at the time of the alleged negligence, that is, the breach of the standard of care; [and] (2) That the death of the fetus was proximately caused by the alleged negligence, or breach of the standard of care, of the defendant."
C.R. 150-55.
[2] There was conflict in Dr. Gilmore's testimony by deposition and his testimony at trial concerning the availability of an ultrasound test during the weekend. At his deposition, he had stated that the test was not available, but at trial he testified that the test was available but that he did not think that it was necessary.
[3] Damages recoverable in a wrongful death action are "to punish the defendant and to deter others from like conduct." Nettles v. Bishop, 289 Ala. 100, 103, 266 So.2d 260, 262 (1972).
[4] I realize that when a mother's privacy rights are balanced against this State interest during the period in which the fetus is not yet viable, the State interest must fail, but this case does not involve conflicting interests, because the interest of the State and the interest of the mother are congruent.
[5] I cannot speculate whether the jury would have reached the same result if they been so instructed, but I do not think that the oral instruction of the trial court was specific enough to satisfy the court's duty to instruct the jury on the law applicable to the case.
[6] Proposed instruction 2 uses the word "person," not "minor child," and therefore may not be relevant.