PARKER, Justice
(concurring specially).
Today, this Court reaffirms that the lives of unborn children are protected by Alabama’s wrongful-death statute, regardless of viability. I write separately to explain why the Supreme Court’s decision in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), does not bar the result we reach today and to emphasize the diminishing influence of Roe’s viability standard. Because Roe is not controlling authority beyond abortion law, and because its viability standard is not persuasive, I conclude that, at least with regard to the law of wrongful death, Roe’s viability standard should be universally abandoned.
I. The uncertain status of the viability standard in tort and criminal law since Roe.
Since 1973, when Roe was decided, laws regarding prenatal injury, wrongful death, and fetal homicide have increasingly abandoned the viability standard expressed in Roe. In prenatal-injury law, “every jurisdiction permits recovery for prenatal injuries if a child is born alive.... This generally holds true regardless whether the injury occurred either before or after the point of viability.... The majority of jurisdictions also recognize a cause of action for the wrongful death of a stillborn, viable fetus.” Crosby v. Glasscock Trucking Co., 340 S.C. 626, 634, 532 S.E.2d 856, 860 (2000) (Toal, J., dissenting) (footnotes omitted) (citing Farley v. Sartin, 195 W.Va. 671, 466 S.E.2d 522 (1995)).
States have been slower to abandon the viability standard in the area of wrongful death. If the child is stillborn, a majority of states and the District of Columbia allow recovery if the injury occurred after viability. See Aka v. Jefferson Hosp., 344 Ark. 627, 637 n. 2, 42 S.W.3d 508, 515 n. 2 (2001) (noting that 32 jurisdictions permitted the recovery of damages for the wrongful death of a viable unborn child). Although some states never permit recovery for the wrongful death of a previable child,[7] other states permit recovery if the *738 previable child is born alive and later dies.[8]
The most significant shift away from the viability standard, however, has been in the law of fetal homicide. At least 38 states have enacted fetal-homicide statutes, and 28 of those statutes protect life from conception. See State v. Courchesne, 296 Conn. 622, 689 n. 46, 998 A.2d 1, 50 n. 46 (2010) (“ ‘[As of March 2010], at least [thirty-eight] states have fetal homicide laws.’ ” (quoting the National Conference of State Legislatures, Fetal Homicide Laws (March 2010) (alterations in Courchesne ))).
Alabama’s homicide statute, for example, defines “person” specifically to include “an unborn child in útero at any stage of development, regardless of viability.” § 13A-6-1 (a)(3), Ala.Code 1975. As Justice See wrote in a special concurrence *739 joined by then Chief Justice Nabers and Justices Stuart, Smith, and Parker in Ziade v. Koch, 952 So.2d 1072, 1082 (Ala.2006), the homicide statute “defines ‘person’ to include an ‘unborn child.’ The legislature has thus recognized under that statute that, when an ‘unborn child’ is killed, a ‘person’ is killed.” See also Ankrom v. State, [Ms. CR-09-1148, Aug. 26, 2011] — So.3d —, —(Ala.Crim.App.2011) (“Alabama’s homicide statute ... does apply to unborn children.”).
Noting that Alabama’s homicide statute protects an unborn child before viability, this Court recently held that, similarly, Alabama’s “Wrongful Death Act permits an action for the death of a previable fetus.” Mack v. Carmack, 79 So.3d 597, 611 (Ala.2011). In deciding that, for purposes of the Wrongful Death Act, a “person” includes an unborn child at any stage of gestation, this Court recognized the arbitrariness of “draw[ing] a line that allows recovery on behalf of a fetus injured before viability that dies after achieving viability but that prevents recovery on behalf of a fetus injured that, as a result of those injuries, does not survive to viability.” Mack, 79 So.3d at 611. These developments in Alabama match a larger pattern; currently, at least nine other states permit recovery for the wrongful death of previa-ble unborn children, five by judicial construction — Missouri, Oklahoma, Utah, South Dakota, and West Virginia[9] — and four by statute — Illinois, Louisiana, Nebraska, and Texas.[10] Georgia and Mississippi permit recovery of damages for the *740 wrongful death of a “quick” unborn child previability.[11] Thus, the law of prenatal injury and fetal homicide has moved decidedly away from the viability standard, while the law of wrongful death has slowly followed.
II. Roe’s viability standard is not controlling authority in wrongful-death law.
Some state courts have applied Roe’s viability standard to wrongful-death law, citing Roe as prohibiting the recovery of damages for the wrongful death of a child who dies without reaching viability.[12] The California Supreme Court held that Roe limited California’s criminal statutes protecting unborn children.[13] Misreading Roe, these courts concluded that the United States Supreme Court held in Roe that states have no interest in protecting the life of an unborn child before viability.
Although broadly written, Roe does not support that conclusion; the states are forbidden to protect unborn children only in ways that conflict with a woman’s “right.” Roe held that a pregnant woman’s “right of privacy ... is broad enough to encompass a woman’s decision whether or not to terminate her pregnancy.” 410 U.S. at 153. See also Planned Parenthood v. Casey, 505 U.S. 833, 844, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (describing Roe as “holding that the Constitution protects a woman’s right to terminate her pregnancy in its early stages”). No one, however, other than a woman seeking to “terminate her pregnancy,” possesses the “right” created in Roe. Nothing in Roe indicated that anyone other than the pregnant woman has any right to terminate her pregnancy and thereby to cause the death of her unborn child.
Roe does not prohibit states from protecting unborn human lives. To the contrary, in Casey, the Supreme Court acknowledged that “the State has legitimate interests from the outset of the pregnancy” in protecting the unborn child, 505 U.S. at 846, and a “substantial state interest in potential life throughout pregnancy.” 505 U.S. at 876. Thus, unless a state’s law conflicts with a woman’s “right” to an abortion, the state law does not conflict with Roe. See also Gonzales v. Carhart, 550 U.S. 124, 158, 127 S.Ct. 1610, 167 *741 L.Ed.2d 480 (2007) (noting that “the State, from the inception of the pregnancy,” has an interest “in protecting the life” of the unborn child). Webster v. Reproductive Health Servs., 492 U.S. 490, 516, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989); and Harris v. McRae, 448 U.S. 297, 313, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980).
Roe ’s statement that unborn children are not “persons” within the meaning of the Fourteenth Amendment is irrelevant to the question whether unborn children are “persons” under state law. Because the Fourteenth Amendment “right” recognized in Roe is not implicated unless state action violates a woman’s “right” to end a pregnancy, the other parts of the superstructure of Roe, including the viability standard, are not controlling outside abortion law.
Many state appellate courts have recognized that, except in the case of abortion, Roe does not limit state criminal or civil protection of the unborn child.[14] Justice Maddox explained this distinction in his dissent in Gentry v. Gilmore, 613 So.2d 1241,1247 (Ala.1993):
“Roe and its progeny address the potential conflicts between a woman’s right to an abortion and the State’s interest in the woman’s health and the fetus’s life. Roe is not implicated when, as in this case, both the State and the mother have congruent interests in preserving life and punishing its wrongful destruction. I conclude that the legislature has a right to protect nonviable fetal life when its interest is congruent with that of the mother.”
Scholars have also recognized the limitations of Roe.[15] For these reasons, Roe is not controlling authority in this case.
*742 III. Roe’s viability standard is not persuasive.
Numerous scholars have criticized the viability rule of Roe.[16] Today, “there is broad academic agreement that Roe failed to provide an adequate explanation for the viability rule.” Randy Beck, Gonzales, Casey, and the Viability Rule, 103 Nw. U.L.Rev. 249, 268-69 (2009).
A. Roe misstated the protection of the unborn child under the common law.
Roe’s viability rule was based, in significant part, on an incorrect statement of legal history. The Supreme Court in Roe erroneously concluded that “the unborn have never been recognized in the law as persons in the whole sense.” 410 U.S. at 162. Roe also referred to “the lenity of the common law.” 410 U.S. at 165. However, scholars have repeatedly pointed to inaccuracies in Roe ⅛ historical account since Roe was decided in 1973.[17] “[T]he history embraced in Roe would not withstand careful examination even when Roe was written.” Joseph Dellapenna, Dispel *743 ling the Myths of Abortion History 126 (Carolina Academic Press 2006).
Sir William Blackstone, for example, recognized that unborn children were persons. Although the Court cited Blackstone in Roe, it failed to note that Blackstone addressed the legal protection of the unborn child within a section entitled “The Law of Persons.” It also ignored the opening line of his paragraph describing the law’s treatment of the unborn child: “Life is an immediate gift of God, a right inherent by nature in every individual.” 1 William Blackstone, Commentaries on the Laws of England *129.[18] As Professor David Kadar noted in 1980, “Rights and protections legally afforded the unborn child are of ancient vintage. In equity, property, crime, and tort, the unborn has received and continues to receive a legal personality.” David Kadar, The Law of Tortious Prenatal Death Since Roe v. Wade, 45 Mo. L.Rev. 639, 639 (1980) (footnotes omitted).
B. Roe misstated the protection of the unborn child under tort law and criminal law.
Professor Kadar and others have pointed out “the mistaken discussion within Roe on the legal status of the unborn in tort law.” Kadar, 45 Mo. L.Rev. at 652. The Court’s discussion in Roe of prenatal-death recovery “was perfunctory, and unfortunately largely inaccurate, and should not be relied upon as the correct view of the law at the time of Roe v. Wade.” 45 Mo. L.Rev. at 652-53. See also William R. Hopkin, Jr., Roe v. Wade and the Traditional Legal Standards Concerning Pregnancy, 47 Temp. L.Q. 715, 723 (1974) (“[I]t must respectfully be pointed out that Justice Blackmun has understated the extent to which the law protects the unborn child.”).
Roe’s adoption of the viability standard in 1973 did not reflect American law. Viability played no role in the common law of property, homicide, or abortion. Clarke D. Forsythe, Homicide of the Unborn Child: The Born Alive Rule and Other Legal Anachronisms, 21 Val. U.L.Rev. 563, 569 n. 33 (1987). And there was no viability standard in wrongful-death law because the common law did not recognize a cause of action for the wrongful death of any person. Farley v. Sartin, 195 W.Va. at 674, 466 S.E.2d at 525 (“At common law, there was no cause of action for the wrongful death of a person.”); W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 127, at 945 (5th ed. 1984) (“The common law not only denied a tort recovery for injury once the tort victim had died, it also refused to recognize any new and independent cause of action in the victim’s dependants or heirs for their own loss at his death.”).
The viability standard was introduced into American law by Bonbrest v. Kotz, 65 F.Supp. 138 (D.D.C.1946), the first case to recognize a cause of action for prenatal injuries. Bonbrest implied that such a cause of action would be recognized only if the unborn child had reached viability. 65 F.Supp. at 140.
*744 Viability was initially adopted by courts in prenatal-injury law, but its influence was waning by 1961. See Daley v. Meier, 33 Ill.App.2d 218, 178 N.E.2d 691 (1961) (holding that an infant born alive could recover damages for injuries suffered before viability); see also Note, Torts — Extension of Prenatal Injury Doctrine to Nonviable Infants, 11 DePaul L.Rev. 361 (1961-62). One thorough legal survey of prenatal-injury law a decade before Roe was decided concluded that “[t]he viability limitation in prenatal injury cases is headed for oblivion. Courts are coming to realize that it is illogical and unjust to the children affected and not readily amenable to scientific proof.” Charles A. Lintgen, The Impact of Medical Knowledge on the Law Relating to Prenatal Injuries, 110 U. Pa. L.Rev. 554, 600 (1962).
C. Roe’s viability standard was dictum.
The viability standard adopted in Roe was dictum. Randy Beck, Self-Conscious Dicta: The Origins of Roe v. Wade’s Trimester Framework, 51 Am. J. Legal Hist. 505, 516-26 (2011). It was not a part of either the Texas statute addressed in Roe or the Georgia statute addressed in Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); neither case was conditioned on viability. In fact, the viability standard was adopted in Roe without any evidentiary record and was not discussed in the briefs or arguments. Beck, 51 Am. J. Legal Hist, at 511-12. The viability rule was also dictum in Casey because the Pennsylvania statute at issue in that case was not conditioned on viability but applied throughout a woman’s pregnancy. Beck, 103 Nw. U.L.Rev. at 271-76.
Additionally, “the Roe Court’s internal correspondence” demonstrates that the Justices themselves recognized that the viability standard was not only “ ‘arbitrary,’ ” but also “ ‘unnecessary.’ ” Beck, 51 Am. J. Legal Hist. 505, 520, 521, 526; see also Randy Beck, The Essential Holding of Casey: Rethinking Viability, 75 UMKC L.Rev. 713, 713 (2007) (quoting Justice Blackmun’s “Internal Supreme Court Memo,” as quoted in David J. Gar-row, Liberty & Sexuality: The Right to Privacy and the Making of Roe v. Wade 580 (1994)) (“ ‘ ‘You will observe that I have concluded that the end of the first trimester is critical. This is arbitrary, but perhaps any other selected point, such as quickening or viability, is equally arbitrary.” ’ ”).
D. Roe’s viability standard was incoherent.
The United States Supreme Court has “never justified” the viability rule of Roe and Casey “in either legal or moral terms.” Randy Beck, 103 Nw. U.L.Rev. at 249; see also Beck, 103 Nw. U.L.Rev. at 253, 268-69 & n. 116 (and authorities cited therein). Justice White explained the lack of foundation for the viability standard in his dissent in Thornburgh v. American College of Obstetricians & Gynecologists, 476 U.S. 747, 794-95, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (White, J., dissenting):
“A second, equally basic error infects the Court’s decision in Roe v. Wade. The detailed set of rules governing state restrictions on abortion that the Court first articulated in Roe and has since refined and elaborated presupposes not only that the woman’s liberty to choose an abortion is fundamental, but also that the State’s countervailing interest in protecting fetal life (or, as the Court would have it, ‘potential human life,’ 410 U.S., at 159) becomes ‘compelling’ only at the point at which the fetus is viable. As Justice O’Connor pointed out three years ago in her dissent in Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. [416], at 461 [(1983) ], the Court’s choice of viability as the point at *745 which the State’s interest becomes compelling is entirely arbitrary. The Court’s ‘explanation’ for the line it has drawn is that the State’s interest becomes compelling at viability ‘because the fetus then presumably has the capacity of meaningful life outside the mother’s womb.’ 410 U.S., at 163. As one critic of Roe has observed, this argument ‘mistakes a definition for a syllogism.’ Ely, The Wages of Crying Wolf: A Comment on Roe v. Wade, 82 Yale L.J. 920, 924 (1973).
“The governmental interest at issue is in protecting those who will be citizens if their lives are not ended in the womb. The substantiality of this interest is in no way dependent on the probability that the fetus may be capable of surviving outside the womb at any given point in its development, as the possibility of fetal survival is contingent on the state of medical practice and technology, factors that are in essence morally and constitutionally irrelevant. The State’s interest is in the fetus as an entity in itself, and the character of this entity does not change at the point of viability under conventional medical wisdom. Accordingly, the State’s interest, if compelling after viability, is equally compelling before viability.”
Similarly, in the article cited by Justice White, Professor John Hart Ely noted that Roe justified the viability standard with a definition:
“The Court’s response here is simply not adequate. It agrees, indeed it holds, that after the point of viability (a concept it fails to note will become even less clear than it is now as the technology of birth continues to develop) the interest in protecting the fetus is compelling. Exactly why that is the magic moment is not made clear: Viability, as the Court defines it, is achieved some six to twelve weeks after quickening. (Quickening is the point at which the fetus begins discernibly to move independently of the mother and the point that has historically been deemed crucial — to the extent any point between conception and birth has been focused on.) But no, it is viability that is constitutionally critical: the Court’s defense seems to mistake a definition for a syllogism.
“‘With respect to the State’s important and legitimate interest in potential life, the ‘compelling’ point is at viability. This is so because the fetus then presumably has the capability of meaningful life outside the mother’s womb.’
“With regard to why the state cannot consider this ‘important and legitimate interest’ prior to viability, the opinion is even less satisfactory.”
John Hart Ely, The Wages of Crying Wolf: A Comment on Roe v. Wade, 82 Yale L.J. 920, 924-25 (1973) (quoting Roe, 410 U.S. at 163, 93 S.Ct. 705) (footnotes omitted).
Neither Roe nor any of the subsequent cases relying on the viability standard have provided any alternative rationale to support that standard: “In the decades since Roe, the Court has offered no adequate rationale for the viability standard, notwithstanding persistent judicial and academic critiques.” Beck, 75 UMKC L.Rev. at 740.
Because of Roe, viability, in abortion law, is a limitation on the exercise of the state’s interest in protecting the unborn child. Outside abortion law, viability has little significance. Viability is largely based on outcome statistics at a specific gestational age, coupled with an estimation of the technological capabilities of a particular facility in medically assisting premature children. As the South Dakota Supreme Court said in Wiersma v. Maple *746 Leaf Farms, 543 N.W.2d 787, 792 (S.D.1996), “ ‘[viability’ as a developmental turning point was embraced in abortion cases to balance the privacy rights of a mother against her unborn child. For any other purpose, viability is purely an arbitrary milestone from which to reckon a child’s legal existence.” (Footnote omitted.)
Viability is irrelevant to determining the existence of prenatal injuries, the extent of prenatal injuries, or the cause of prenatal death. Viability is irrelevant to proving causation because the unborn child’s anatomic condition can be observed regardless of viability and, if the unborn child dies, the cause of its death can be determined by autopsy regardless of the child’s gestational age. Viability does not affect the child’s loss of life or the damages suffered by the surviving family. There is no evidence that permitting recovery of damages for the wrongful death of a child before viability will increase fraudulent litigation. See 66 Federal Credit Union v. Tucker, 853 So.2d 104,113 (Miss.2003).
Quite simply, the use of viability as a standard in prenatal-injury or wrongful-death law is incoherent. As the West Virginia Supreme Court concluded in Farley: “[J]ustice is denied when a tortfeasor is permitted to walk away with impunity because of the happenstance that the unborn child had not yet reached viability at the time of death.” 466 S.E.2d at 533. Though a number of rationales were originally cited for the viability rule in prenatal-injury or wrongful-death law, the sole remaining justification of not abandoning viability in wrongful-death law seems to be deference to legislative bodies, a rather strange rationale for caution in abandoning a judicially created rule.
Since Roe was decided in 1973, advances in medical and scientific technology have greatly expanded our knowledge of prenatal life. The development of ultrasound technology has enhanced medical and public understanding, allowing us to watch the growth and development of the unborn child in a way previous generations could never have imagined. Similarly, advances in genetics and related fields make clear that a new and unique human being is formed at the moment of conception, when two cells, incapable of independent life, merge to form a single, individual human entity.[19] Of course, that new life is not yet mature — growth and development are nec *747 essary before that life can survive independently — but it is nonetheless human life. And there has been a broad legal consensus in America, even before Roe, that the life of a human being begins at conception.[20] An unborn child is a unique and individual human being from conception, and, therefore, he or she is entitled to the full protection of law at every stage of development.

Conclusion

Roe’s viability rule was based on inaccurate history and was mostly unsupported by legal precedent. Medical advances since Roe have conclusively demonstrated that an unborn child is a unique human being at every stage of development. And together, Alabama’s homicide statute, the decisions of this Court, and the statutes and judicial decisions from other states make abundantly clear that the law is no longer, in Justice Blaekmun’s words, “reluctant ... to accord legal rights to the unborn.” For these reasons, Roe ⅛ viability rule is neither controlling nor persuasive here and should be rejected by other states until the day it is overruled by the United States Supreme Court.
STUART, BOLIN, and WISE, JJ„ concur.

. See Aka, 344 Ark. at 640, 42 S.W.3d at 516-17; Bolin v. Wingert, 764 N.E.2d 201, 207 (Ind.2002); Humes v. Clinton, 246 Kan. 590, 596, 792 P.2d 1032, 1037 (1990); Kandel v. *738 White, 339 Md. 432, 433, 663 A.2d 1264, 1265 (1995); Thibert v. Milka, 419 Mass. 693, 695, 646 N.E.2d 1025, 1026 (1995); Fryover v. Forbes, 433 Mich. 878, 446 N.W.2d 292 (1989); Blackburn v. Blue Mountain Womens Clinic, 286 Mont. 60, 86, 951 P.2d 1, 16 (1997) (reaffirming Kuhnke v. Fisher, 210 Mont. 114, 119-20, 683 P.2d 916, 919 (1984) (holding that an unborn child is not a "minor child,” as that term is defined by statute)); Wallace v. Wallace, 120 N.H. 675, 677, 421 A.2d 134, 136 (1980); Miller v. Kirk, 120 N.M. 654, 657, 905 P.2d 194, 197 (1995); LaDu v. Oregon Clinic, P.C., 165 Or.App. 687, 693, 998 P.2d 733, 736 (2000) ("[N]othing in the statutory context indicates that a nonviable fetus is to be considered a ‘person' for purposes of the wrongful death statutes.”), cert. denied, 331 Or. 244, 18 P.3d 1099 (2000); Coveleski v. Bubnis, 535 Pa. 166, 170, 634 A.2d 608, 611 (1993); Miccolis v. AMICA Mut. Ins. Co., 587 A.2d 67, 71 (R.I.1991); Crosby, 340 S.C. at 629, 532 S.E.2d at 857; and Baum v. Burrington, 119 Wash.App. 36, 43, 79 P.3d 456, 459-60 (2003), cert. denied, 151 Wash.2d 1035, 95 P.3d 758 (2004).

. See, e.g., Hornbuckle v. Plantation Pipe Line Co., 212 Ga. 504, 505, 93 S.E.2d 727, 728 (1956) ("Where a child is born after a tortious injury sustained at any period after conception, he has a cause of action.”); Kelly v. Gregory, 125 N.Y.S.2d 696, 697, 282 A.D. 542, 543-44 (1953) (”[L]egal separability should begin where there is biological separability. We know something more of the actual process of conception and foetal development now than when some of the common law cases were decided; and what we know makes it possible to demonstrate clearly that separability begins at conception.”); Simon v. Mullin, 34 Conn.Supp. 139, 147, 380 A.2d 1353, 1357 (1977) ("The development of the principle of law that now permits recovery by or on behalf of a child born alive for prenatal injuries suffered at any time after conception, without regard to the viability of the fetus, is a notable illustration of the viability of our common law.1'); Bennett v. Hymers, 101 N.H. 483, 485, 486, 147 A.2d 108, 110 (1958) ("We adopt the opinion that the fetus from the time of conception becomes a separate organism and remains so throughout its life.... We hold therefore that an infant born alive can maintain an action to recover for prenatal injuries inflicted upon it by the tort of another even if it had not reached the state of a viable fetus at the time of injury.”); Smith v. Brennan, 31 NJ. 353, 367, 157 A.2d 497, 504 (1960) ("We see no reason for denying recovery for a prenatal injury because it occurred before the infant was capable of separate existence .... Whether viable or not at the time of the injury, the child sustains the same harm after birth, and therefore should be given the same opportunity for redress.”); Sinkler v. Kneale, 401 Pa. 267, 273, 164 A.2d 93, 96 (1960) (“As for the notion that the child must have been viable when the injuries were received, which has claimed the attention of several of the states, we regard it as having little to do with the basic right to recover, when the foetus is regarded as having existence as a separate creature from the moment of conception.”); Torigian v. Watertown News Co., 352 Mass. 446, 449, 225 N.E.2d 926, 927 (1967) ("We are not impressed with the soundness of the arguments against recovery. They should not prevail against logic and justice. We hold that the plaintiff's intestate was a ‘person’ ” for the purposes of the wrongful-death statute.); and Day v. Nationwide Mut. Ins. Co., 328 So.2d 560, 562 (Fla.Dist.Ct.App.1976) (“We hold that a child bom alive, having suffered prenatal injuries at any time after conception, has a *739 cause of action against the alleged tortfea-sor.”).

. Missouri: Connor v. Monkem Co., 898 S.W.2d 89, 92 (Mo. 1995) (”[W]e cannot avoid the conclusion that the legislature intended the courts to interpret 'person' within the wrongful death statute to allow a natural parent to state a claim for the wrongful death of his or her unborn child, even prior to viability.”); Oklahoma: Pino v. United States, 183 P.3d 1001, 1005 (Okla.2008) (“Our construction of [Oklahoma's wrongful-death statute] and the Oklahoma Constitution requires that a remedy be afforded for the death of a fetus, whether or not viable and whether or not bom alive, and prohibits abrogating such an action.”); Utah: Carranza v. United States, 267 P.3d 912, 913 (Utah 2011) (holding "that the statute allows an action for the wrongful death of an unborn child; the term 'minor child,' as used in the statute, includes an unborn child” and noting that the language of the statute being interpreted by that court had since been amended); South Dakota: Wiersma v. Maple Leaf Farms, 543 N.W.2d 787, 791 (S.D.1996) ("Based on our reading of [South Dakota Codified Law] 21-5-1, we conclude the Legislature clearly intended to encompass nonviable children in the term 'unborn child.'”); West Virginia: Farley v. Sartin, 195 W.Va. 671, 683, 466 S.E.2d 522, 534 (1995) ("[W]e, therefore, hold that the term 'person' ... encompasses a nonviable unborn child and, thus, permits a cause of action for the tortious death of such child.”).

. Illinois: 740 Ill. Comp. Stat. 180/2.2 (2011) ("The state of gestation or development of a human being when an injury is caused, when an injury takes effect, or at death, shall not foreclose maintenance of any cause of action under the law of this State arising from the death of a human being caused by wrongful act, neglect or default.”); Louisiana: La. Civ.Code Ann. art. 26 (1999) ("An unborn child shall be considered as a natural person for whatever relates to its interests from the moment of conception. If the child is born dead, it shall be considered never to have existed as a person, except for purposes of actions resulting from its wrongful death.”); Nebraska: Neb.Rev.Stat. § 30-809(1) (2010) ("Whenever the death of a person, including an unborn child in útero at any stage of gestation, is caused by the wrongful act, neglect, or default ... the person who ... would have been liable if death had not ensued, is liable in an action for damages, notwithstanding the death of the person injured....”); Texas: Texas Civil Practice & Remedies Code Ann. § 71.001(2) and (4) (2011) ("'Person' means an individual.... ‘Individual’ includes an unborn child at every stage of gestation from fertilization until birth.”).

. See Porter v. Lassiter, 91 Ga.App. 712, 716, 87 S.E.2d 100, 103 (1955) (" '[A] suit may be maintained by the mother for the loss of a child that was "quick” in her womb at the time of the homicide.... The court does not believe it necessary for the child to be "viable” provided it was "quick”, that is "able to move in its mother's womb.” ' ” (quoting the trial court)); 66 Federal Credit Union v. Tucker, 853 So.2d 104, 112 (Miss.2003) ("[W]e hold that our wrongful death statute includes a fetus who is 'quick' in the womb as a person’ within the language of that statute.”). See also Shirley v. Bacon, 154 Ga.App. 203, 204, 267 S.E.2d 809, 811 (1980) (explaining that "[t]he mere fact that [the mother] had not felt the movement of the fetus does not necessarily mean that the fetus did not move or was not capable of movement at the time of the unborn child’s death”).

. See, e.g., Toth v. Goree, 65 Mich.App. 296, 304, 237 N.W.2d 297, 301 (1975) ("There would be an inherent conflict in giving the mother the right to terminate the pregnancy yet holding that an action may be brought on behalf of the same fetus under the wrongful death act.”); Wallace v. Wallace, 120 N.H. 675, 679, 421 A.2d 134, 137 (1980) ("[I]t would be incongruous for a mother to have a federal constitutional right to deliberately destroy a nonviable fetus ... and at the same time for a third party to be subject to liability to the fetus for his unintended but merely negligent acts.”). See also Aka, 344 Ark. at 641, 42 S.W.3d at 517-18; Justus v. Atchison, 19 Cal.3d 564, 577-78, 139 Cal.Rptr. 97, 565 P.2d 122, 130-31 (1977), disapproved on other grounds, Ochoa v. Superior Court, 39 Cal.3d 159, 216 Cal.Rptr. 661, 703 P.2d 1 (1985); Hamby v. McDaniel, 559 S.W.2d 774, 778 (Tenn.1977); and State ex. rel. Hardin v. Sanders, 538 S.W.2d 336, 339 (Mo.1976).

.People v. Smith, 59 Cal.App.3d 751, 129 Cal.Rptr. 498, 501 (1976).

. See, e.g., Wiersma v. Maple Leaf Farms, 543 N.W.2d 787, 792 (S.D.1996) (Roe’s viability standard not applicable to wrongful-death action); Commonwealth v. Bullock, 590 Pa. 480, 491-92, 913 A.2d 207, 214 (2006) (Roe does not prohibit charging killer of unborn child with murder); State v. MacGuire, 84 P.3d 1171, 1179-80 (Utah 2004) (Parrish, J., concurring) (Roe does not prohibit charging killer of unborn child with murder); 66 Federal Credit Union v. Tucker, 853 So.2d 104, 113-14 (Miss.2003) (Roe does not apply to action brought under wrongful-death statute); Farley v. Sartin, 195 W.Va. 671, 683-84 & n. 28, 466 S.E.2d 522, 534-35 & n. 28 (Roe does not apply to wrongful-death action); People v. Davis, 1 Cal.4th 797, 809, 30 Cal.Rptr.2d 50, 872 P.2d 591, 598 (1994) (Roe's viability standard does not apply in the context of fetal murder); State v. Merrill, 450 N.W.2d 318, 322 (Minn.1990) (“Roe v. Wade protects the woman's right of choice; it does not protect, much less confer on an assailant, a third-party unilateral right to destroy the fetus.”), cert. denied, 496 U.S. 931, 110 S.Ct. 2633, 110 L.Ed.2d 653 (1990); Summerfield v. Superior Court, 144 Ariz. 467, 478, 698 P.2d 712, 723 (1985) (Roe does not apply to wrongful-death action); and O’Grady v. Brown, 654 S.W.2d 904, 910 (Mo.1983) (noting that Roe, “while holding that the fetus is not a person for purposes of the 14th amendment, does not mandate the conclusion that the fetus is a nonentity”). See also Crosby, 340 S.C. at 642, 532 S.E.2d at 864 (Toal, J., dissenting) ("Unlike abortion cases, wrongful death actions do not automatically implicate any countervailing constitutional liberties. No one can argue in this case that the state or federal constitution shields the defendants’ allegedly wrongful conduct.”); Lawrence v. State, 240 S.W.3d 912, 917-18 & n. 24 (Tex.Crim.App.2007) (Roe does not prohibit state from charging killer of unborn child with capital murder), cert. denied, 553 U.S. 1007, 128 S.Ct. 2056, 170 L.Ed.2d 798 (2008); State v. Alfieri, 132 Ohio App.3d 69, 78-79, 724 N.E.2d 477, 483 (1998) (Roe does not prohibit state from criminalizing fetal homicide); and People v. Ford, 221 Ill.App.3d 354, 368-69, 163 Ill.Dec. 766, 581 N.E.2d 1189, 1199 (1991) (Roe does not apply to third-party assault of pregnant woman, which kills the unborn child).

. See, e.g., Clarke D. Forsythe, Homicide of the Unborn Child: The Born Alive Rule and Other Legal Anachronisms, 21 Val. U.L.Rev. 563, 614 (1987) ("[Roe ] does not apply to the context of nonconsensual third party acts *742 against the unborn child.”); Jeffrey A. Parness, Crimes Against the Unborn: Protecting and Respecting the Potentiality of Human Life, 22 Harv. J. on Legis. 97, 112 (1985) ("The decision in Roe does not preclude the state from protecting previable fetal life when such protection is reasonable and infringes upon no fundamental or other federal or state right....”); and David Kadar, The Law of Tortious Prenatal Death Since Roe v. Wade, 45 Mo. L.Rev. 639, 657 (1980) (“Roe v. Wade neither prohibits nor compels consistency of interpretation of the meaning of ‘person’ as between the fourteenth amendment and wrongful death statutes.”).

. Randy Beck, Self-Conscious Dicta: The Origins of Roe v. Wade's Trimester Framework, 51 Am. J. Legal Hist. 505, 516-26 (2011); Randy Beck, Gonzales, Casey, and the Viability Rule, 103 Nw. U.L.Rev. 249, 268-70 (2009); Paul Benjamin Linton, Planned Parenthood v. Casey; The Flight From Reason in the Supreme Court, 13 St. Louis U. Pub.L.Rev. 15, 38-40 (1993); Mark Tushnet, Two Notes on the Jurisprudence of Privacy, 8 Const. Com. 75, 83 (1991) ("[Ujsing the line of viability to distinguish the time when abortion is permitted from the time after viability when it is prohibited (as Roe v. Wade does), is entirely perverse.”); John Hart Ely, The Wages of Crying Wolf: A Comment on Roe v. Wade, 82 Yale L.J. 920, 924-25 (1973); and Mark J. Beutler, Abortion and the Viability Standard — Toward a More Reasoned Determination of the State's Countervailing Interest in Protecting Prenatal Life, 21 Seton Hall L.Rev. 347, 359 (1991) ("It is difficult to understand why viability should be relevant to, much less control, the measure of a state’s interest in protecting prenatal life.”). See generally Douglas E. Ruston, The Tortious Loss of a Nonviable Fetus: A Miscarriage Leads to a Miscarriage of Justice, 61 S.C. L.Rev. 915 (2010); Justin Curtis, Including Victims Without a Voice: Amending Indiana's Child Wrongful Death Statute, 43 Val. U.L.Rev. 1211 (2009); and Sarah J. Loquist, The Wrongful Death of a Fetus: Erasing the Barrier Between Viability and Nonviability, 36 Washburn L.J. 259 (1997); see also the sources cited by Justice Maddox in his dissent in Gentry v. Gilmore, 613 So.2d at 1248-49.

. See generally Joseph Dellapenna, Dispelling the Myths of Abortion History (Carolina Academic Press 2006); John Keown, Abortion, Doctors and the Law: Some Aspects of the Legal Regulation of Abortion in England from 1803 to 1982 (Cambridge University Press 1988). See also Paul Benjamin Linton, Planned Parenthood v. Casey; The Flight from Reason in the Supreme Court, 13 St. Louis U. Pub.L.Rev. 15 (1993); Dennis J. Horan, Clarke D. Forsythe & Edward R. Grant, Two Ships Passing in the Night: An Interpretavist Review of the White-Stevens Colloquy on Roe v. Wade, 6 St. Louis U. Pub. L.Rev. 229, 230 n. 8, 241 n. 90 (1987); James S. Witherspoon, Reexamining Roe; Nineteenth Century Abortion Statutes and the Fourteenth Amendment, 17 St. Mary's L.J. 29, 70 (1985) ("In short, the Supreme Court’s analysis in Roe v. Wade of the development, purposes, and the understandings underlying the nineteenth-century antiabortion statutes, was fundamentally erroneous.”); and Robert Byrn, An American Tragedy: The Supreme Court on Abortion, 41 Fordham L.Rev. 807 (1973).

. See Dellapenna, at 200:
"[MQodem research has established that by the close of the seventeenth century, the criminality of abortion under the common law was well established. Courts had rendered clear holdings that abortion was a crime, no decision indicated that any form of abortion was lawful, and secondary authorities similarly uniformly supported the criminality of abortion. The only difference among these authorities had been the severity of the crime (misdemeanor or felony), an uncertainty that, under Coke's influence, began to settle into the pattern of holding abortion to be a misdemeanor unless the child was born alive and then died from the injuries or potions that led to its premature birth.”

. See, e.g., Bruce M. Carlson, Human Embryology and Developmental Biology 3 (1994) ("Human pregnancy begins with the fusion of an egg and a sperm...."); Ronan O’Rahilly & Fabiola Muller, Human Embryology and Teratology 8 (2d ed. 1996) ("Although life is a continuous process, fertilization is a critical landmark because, under ordinary circumstances, a new, genetically distinct human organism is thereby formed. This remains true even though the embryonic genome is not actually activated until 4-8 cells are present, at about 2-3 days.”); Keith Moore, The Developing Human: Clinically Oriented Embryology 2 (8th ed. 2008) (The zygote "results from the union of an oocyte and a sperm during fertilization. A zygote or embryo is the beginning of a new human being.”); Ernest Blechschmidt, The Beginning of Human Life 16-17 (1977) ("A human ovum possesses human characteristics as genetic carriers, not chicken or fish. This is now manifest; the evidence no longer allows a discussion as to if and when and in what month of ontogenesis a human being is formed. To be a human being is decided for an organism at the moment of fertilization of the ovum.”); C.E. Corliss, Patten's Human Embryology: Elements of Clinical Development 30 (1976) (“It is the penetration of the ovum by a sperm and the resultant mingling of the nuclear material each brings to the union that constitutes the culmination of the process of fertilization and marks the initiation of the life of a new individual.”); and Clinical Obstetrics 11 (Carl J. Pauerstein ed. 1987) ("Each member of a species begins with fertilization — the successful merging of two different pools of genetic information to form a new individual.”).

. See Paul Benjamin Linton, Planned Parenthood v, Casey: The Flight From Reason in the Supreme Court, 13 St. Louis U. Pub.L.Rev. 15, 120-137 (1993) ("Appendix B: The Legal Consensus on the Beginning of Life,” citing caselaw and statutes from 38 states and the District of Columbia stating that the life of a human being should be protected beginning with conception).